Barry Dean KELLY, Appellant,

v.

STATE of Texas, State.

No. 2-89-026-CR.

Court of Appeals of Texas, Fort Worth.

June 27, 1990.

Rehearing Overruled July 31, 1990.

Discretionary Review Granted Oct. 10, 1990.

Richard Alley, Fort Worth, for appellant.

Tim Curry, C. Chris Marshall, Alan Levy, Robert K. Gill, Betty Marshall, Asst. Crim. Dist. Attys., for State.

Before JOE SPURLOCK, II, HILL, and MEYERS, JJ.

## OPINION

MEYERS, Justice.

Appellant, Barry Dean Kelly, appeals from a murder conviction wherein he was sentenced by a jury to life imprisonment in the Texas Department of Corrections.[1] Appellant complains the trial court erred as follows: (1) in overruling appellant's "Frye Motion" challenging the admissibility and scientific reliability of DNA genetic fingerprinting test result evidence and procedures; (2) in permitting the introduction before the jury of DNA genetic fingerprinting test results and procedures; and (3) in overruling appellant's motion for mistrial because of juror misconduct. Appellant also challenges the sufficiency of the evidence. We overrule appellant's points of error and affirm the judgment of the trial court.

Mary Earlene Copeland testified she met appellant, a white male, in December, 1986. They dated for a couple of months and, during that time, had a sexual relationship. That relationship included sex in Copeland's room at home, but never involved sex in the room or on the bed or bedspread belonging to Copeland's mother, Melva Teems, a 63–year–old widow. The sexual relationship ended in February, 1987, when appellant got married, though appellant began to call Copeland again in the summer of 1987. Teems was introduced to appellant, lent him money to buy gas and get his car radiator fixed, and bought a 1974 Ford Fairlane from him. At no time, however, was appellant ever inside Teems' 1968 blue and white Ford pickup truck.

On October 5, 1987, when Copeland left the house about 7:15 p.m. to go to a lounge, Teems was planning to take her regular evening walk and was wearing a T–shirt

---

1. Now the Texas Department of Criminal Justice, Institutional Division.

bearing the name of her son, Michael's, rock-and-roll band, "Looker."

Copeland further testified that she left the lounge about 12:15 a.m. and returned home. As she parked her car, she noticed her mother's truck was gone. Inside the house, her mother was gone and several things were out of place; the blue jeans her mother had been wearing earlier and a yellow rag lay on her mother's bedroom floor; the mattress was pushed off her mother's bed a little bit and the bed was messed up; a bra with a missing clasp was lying on her mother's bed; a drawer in her mother's chest of drawers was open and a .22 automatic usually wrapped in the yellow rag was missing; her mother's purse which usually contained her mother's wedding rings was missing; a butcher knife was on a kitchen counter; and her mother's checkbook was on the dining room table. Copeland described her mother as a very particular housekeeper. Teems' nightgown was still under her bed pillow, as were three envelopes containing $580; money Teems had saved all year for the annual church trip. Copeland called a neighbor and then her brother, Michael. After Michael looked around the house, they called the police. An officer came out and took down some information for a missing persons report.

Lynn Sims, a prostitute, testified that at about 11:00 p.m., sometime during the first week of October, she got a ride from appellant from Evans Street over to Rosedale Street in Fort Worth. Sims had known appellant awhile, and knew he usually drove a yellow Ford. She said that on that night, however, he was driving a truck which Sims identified as State's Exhibits Nos. 2 and 3, or Teems' truck. Sims recalled that appellant did not appear to know how to drive the truck and he kept missing gears. The record reveals that Teems' truck had a manual transmission. Sims also stated that appellant had money with him, including $100 and $50 bills, which was unusual. She went on to say that during the ride appellant stopped, tied a rope around his arm, and injected what appeared to be cocaine into his arm. Sims identified the rope as State's Exhibit No.

24A, the rope later found in the truck. Sims stated that during the ride she was wearing plum-colored lipstick and lit one of appellant's cigarettes with a wooden match and smoked the cigarette all the way down to the filter.

Another prostitute, Sharon Marie Byrd, testified she was also used to seeing appellant along Rosedale Street in a yellow Ford, but on two occasions on the same day she saw him in a blue and white truck. The first time she saw him, about 4:00 or 5:00 a.m., he was alone in the truck on East Rosedale, and she spoke to him for a few minutes. The second time, about four hours later, he was on Allen Street, and he had three other people in the truck with him. Byrd also identified the truck as Teems' truck, in particular because of rust spots on the side.

Yet another prostitute, Brenda Joyce Reese, recalled seeing appellant in Teems' truck on Rosedale Street a little after 10:00 p.m. After he honked, she flagged him down and got in the truck. Reese further stated that appellant took her with him and bought some heroin and cocaine for $20. She said they cooked the heroin, added the cocaine, and shot it into their arms with a syringe. As they drove around afterward, appellant showed Reese a watch and some rings and necklaces he said he was going to sell. Reese identified one of the rings as State's Exhibit No. 13, Teems' ring. Reese said appellant told her he had gotten the ring from an old lady, and that the truck would be "hot" soon.

Vance White, owner of Texas Tire on Hemphill Street, testified that on October 6, in the late morning, appellant sold a set of wedding rings to him for $450 in cash. White recalled that appellant arrived at Texas Tire on foot. White identified the rings as State's Exhibit No. 13, or Teems' rings. Peggy Coop, a longtime friend of Teems, also identified the rings sold to White as those belonging to Teems. White further stated that on October 13, a man identifying himself as the seller of the rings called him about the rings. The record indicates the call was a collect call from cell # 16E of the Tarrant County Jail

where appellant had been incarcerated since October 10.

An employee of Hemphill Motors testified that on October 6, at about 1:30 p.m., appellant bought a Ford LTD from Hemphill Motors on Hemphill Street, about a block and a half from Texas Tire, for a $325 cash down payment. He was seen driving the LTD at the intersection of Rosedale and Mansfield Streets at about 2:50 p.m. by a Fort Worth police officer.

At about 2:00 p.m. on October 6, a police officer found Teems' truck behind Panther Hall on South Collard Street. There was no key in the ignition, but it had not been hot-wired and was locked. After the truck was towed, it was examined for fingerprints. One fingerprint, from inside the passenger-side vent window was identified as appellant's. Human blood was discovered on the driver's side seatcover, the driver's side floor mat, the ceiling above the driver's seat, and a rope was also found on the seat. After examination, the only blood present in sufficient quantities to be tested was the blood on the floor mat, which was inconsistent with appellant's blood. Also in the truck was a small plastic envelope containing cocaine residue, a cigarette butt with lipstick on it, and wooden matchsticks.

On October 17, Fort Worth Police Officer Scott Hood found Teems' body near a dry creek bed off a dirt road northwest of the junction of I–35 and North Loop 820, approximately two miles from appellant's last place of employment. Dr. Charles H. Harvey, Deputy Medical Examiner for Tarrant and Parker Counties, stated that the body was very decomposed, consistent with a date of death of October 6, and was wearing jeans, tennis shoes, and a blue T-shirt bearing the name of the rock band, "Looker," but no bra. Because of the advanced state of decomposition, it was impossible to determine Teems' blood type or if she had been sexually assaulted. It was possible, however, to determine that she had been strangled, probably with the piece of material ripped off the bottom of her own T-shirt and still tied around her neck.

Copeland stated that on October 21, the day Teems was buried, she found a bra hook in her mother's bedroom which matched the one missing from the bra found earlier on the bed. The same day, she noticed a yellow stain on her mother's bedspread. The bedspread had been purchased in May, 1987, after Copeland's sexual relationship with appellant had ended. The stain on the bedspread was identified as semen from a type "O" secretor with PGM type $1 + 1 -$, which subgroup includes about 10% of white males. The record shows appellant is a type "O" secretor with PGM type $1 + 1 -$. Further testing of the semen at a DNA testing laboratory, Lifecodes Corporation, showed that the semen could have come from appellant. The statistical probability that the semen came from another white male was 1 in 13.5 million.

In his first two points of error, appellant argues the trial court erred in overruling appellant's "Frye Motion" and admitting expert testimony on DNA because the DNA evidence was not reliable under either the relevancy standard or the "Frye" standard.

At the hearing on the admission of the DNA evidence the State called five witnesses.

Dr. Philip S. Hartman, an associate professor of biology at Texas Christian University, testified he was a member of a number of professional societies, including the Genetic Society of America, the American Society for Photobiology, and the American Association for the Advancement of Science. He stated he has never been affiliated with Lifecodes Corporation (a corporation which does DNA analysis for paternity testing, forensic testing, and medical diagnostics) in any capacity. In addition to explaining many of the working terms used in working with DNA, Hartman detailed the process used in DNA tests on blood or semen and the possible problems associated with the various steps of a DNA test.

Hartman stated that DNA testing is very common and has been used extensively in human genetics to successfully track spe-

cific genetic diseases. He noted that, if sufficient probes are used, an unknown DNA sample can be compared to a known DNA donor sample to determine if they came from the same donor. He also remarked that there existed no possibility of a false DNA match between known and unknown samples using the procedures he described. Furthermore, all of the scientific procedures in DNA testing are "straight-forward," known, and accepted scientific techniques.

Dr. Joseph F. Sambrook, testified that he is the holder of a distinguished chair in molecular biology at Southwestern Medical School, chairman of the school's biochemistry department, and specializes in DNA. He claimed to have written over 100 research papers, some of which have been published in various journals in the field as well as a book called *Molecular Cloning* which he describes as the technical "Bible" of the field. Sambrook is not associated with Lifecodes but has read theses and articles written by the PhD's affiliated with Lifecodes. In his opinion, DNA tests are reliable enough to be accepted in court as evidence in a criminal case.

Dr. Robert C. Benjamin, assistant professor of biological science at the University of North Texas and holder of a PhD in biology from Harvard, testified he did postdoctoral work in biochemistry at Johns Hopkins and was a member of the American Academy for the Advancement of Science and the American Society of Microbiology. Benjamin stated his specialty is recombinant DNA. Benjamin thereafter restated much of the information already testified to about DNA and vouched for the widespread use and acceptance of DNA testing and population studies. Even though Benjamin stated no Texas company used the same forensic DNA genetic fingerprinting testing as Lifecodes does, he had also seen published protocols from Lifecodes and found them to be accepted, state-of-the-art procedures.

Alan M. Guisti, a physical scientist with the FBI and formerly a forensic scientist at Lifecodes, received six years on-the-job-training at Lifecodes. He testified he performed the DNA tests on appellant's blood, thigh muscle from Teems' body, and the semen stain found on Teems' bedspread, and such tests were performed in accordance with Lifecodes' protocols for such tests. Guisti then detailed the procedures he used in testing the samples in this case and the results of his tests. Guisti admitted that Lifecodes had changed its procedures since the testing done in this case.

Dr. Kevin McElfresh stated he holds a PhD in molecular and population genetics and is the assistant manager and laboratory supervisor at Lifecodes. McElfresh said that, according to Lifecodes' DNA testing, the semen stain found on Teems' bedspread matched the sample taken from appellant. He noted that the statistical probabilities of such a match being incorrect was one in thirteen million.

Appellant presented one witness at the hearing, John T. Castle, owner and operator of Castle Forensic Laboratories in Dallas. Castle holds a Bachelor's degree in chemistry and was certified to teach life and earth sciences in public schools. In Castle's opinion, radioactive technology was too new to be generally accepted in the scientific community. Castle felt that samples could become contaminated by the DNA of other organisms or by the reuse of laboratory materials. He noted that in one evaluation, Lifecodes had failed to identify thirty percent of samples submitted because the company did not "amplify" or grow more DNA before running the tests, and he also criticized Lifecodes for totally consuming samples during tests.

On cross-examination, he admitted that he had no problems with the isolation of DNA, including a screening probe to distinguish human DNA from the DNA of other organisms, and he had no problems with recombinant DNA, restriction enzymes, Southern blotting, electrophoresis, denaturization, or the binding of a radio-active probe.

At the conclusion of the hearing, the trial court denied appellant's motion to exclude the DNA evidence. According to the trial court, the evidence of DNA testing was probative, relevant, and its relevancy out-

weighed any prejudicial effect, and the testing itself was reliable and generally accepted in the relevant scientific community.

Appellant contends that the trial court erred in overruling appellant's *Frye* motion and admitting the DNA evidence. He admits that the scientific principles of DNA testing are accepted and that the State's experts were qualified to testify as to DNA testing. He complains only that: 1) Lifecodes' procedures are unreliable, not certain and acceptable enough to be admissible in a criminal trial; and 2) none of the State's experts demonstrated sufficient expertise in genetic statistics.

■ The reliability of scientific evidence depends upon three factors: 1) the validity of the underlying scientific principle; 2) the validity of the technique applying that principle; and 3) the proper application of the technique on a particular occasion. *See* Gianelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later,* 80 Colum.L.Rev. 1197, 1200–01 (1980); *see also United States v. Downing,* 753 F.2d 1224, 1234 (3rd Cir.1985); *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985, 987 (N.Y. Sup.Ct.1989).

Two questions arise before these three factors can be applied. First, what is the correct standard? And, second, does the third factor, proper application, go only to the weight of the evidence and not its admissibility, thereby making it a question for the jury and not the trial court?

■ The answer to the second question may depend on the unique qualities of the scientific evidence. Once a scientific technique is sufficiently established, its proper application on a particular occasion becomes merely a question for the jury. *See* Gianelli, *supra,* at 1202; *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3399, 77 L.Ed.2d 1090 (1983).

■ The answer to the first question is not so simple. There are two evidentiary standards employed by courts to determine the admissibility of evidence based on a novel scientific technique, the *Frye* standard, and the "relevancy" standard.

Until recently, most courts used the standard set out in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Under the *Frye* standard, expert testimony based on a novel scientific technique is admitted if the underlying principle and the technique are generally accepted in the relevant scientific community. *Id.* at 1014.

When the DNA issue has arisen in other jurisdictions, the *Frye* standard has held a general acceptance in areas including the First Circuit; Seventh Circuit; Tenth Circuit; D.C. Circuit; New York; Minnesota; West Virginia; and California. *People v. Shi Fu Huang,* 145 Misc.2d 513, 546 N.Y. S.2d 920, 921 (N.Y.Co.Ct.1989); *Castro,* 545 N.Y.S.2d at 986; *People v. Wesley,* 140 Misc.2d 306, 533 N.Y.S.2d 643, 659 (N.Y.Co. Ct.1988); *State v. Schwartz,* 447 N.W.2d 422, 424–25 (Minn.1989); *State v. Woodall,* 385 S.E.2d 253, 259 (W.Va.1989).

A standard consistent with *Frye* exists in TEX.R.CRIM.EVID. 401, 402, and 702, known as the "relevancy" standard, is being utilized by a growing number of courts. Under the relevancy standard, expert testimony based on novel scientific evidence is admitted if it is relevant and its probative value outweighs such dangers as the potential of the evidence to mislead the jury. TEX.R.CRIM.EVID. 401, 403, and 702; Gianelli, *supra,* at 1235.

Additionally, some jurisdictions hold that the relevancy standard incorporates the *Frye* standard: Second Circuit; Fourth Circuit; Fifth Circuit; Sixth Circuit; Eighth Circuit; Ninth Circuit; and Utah. *See* Comment, *DNA Fingerprinting,* 26 Hous. L.Rev. at 687 n. 90; *United States v. McBride,* 786 F.2d 45, 49 (2nd Cir.1986); *Barrel of Fun, Inc. v. State Farm Fire & Casualty Ins. Co.,* 739 F.2d 1028, 1031 n. 9 (5th Cir.1984); *Kofford v. Flora,* 744 P.2d 1343, 1347–48 (Utah 1987).

In general, expert testimony is admissible if the witness is qualified as an expert, the testimony will assist the jury, and the probative value of the testimony is not substantially outweighed by its prejudicial effect. *See* TEX.R.CRIM.EVID. 401, 403,

and 702; *Pierce v. State,* 777 S.W.2d 399, 414–15 (Tex.Crim.App.1989) (en banc). The burden of proof is on the proponent of the evidence to establish the predicate facts by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). The decision is made by the trial court and will not be overturned on appeal absent an abuse of discretion. *See* TEX.R.CRIM. EVID. 104(a); *Pierce,* 777 S.W.2d at 414–15.

We agree with the State that these general rules seemingly apply to all expert testimony, even expert testimony based on novel scientific evidence. *See e.g., Fielder v. State,* 756 S.W.2d 309, 318–21 (Tex.Crim. App.1988) (psychological testimony as to battered woman syndrome). Appellant relies on *Zani v. State,* 758 S.W.2d 233 (Tex. Crim.App.1988) (en banc), where the Court of Criminal Appeals announced that the *Frye* rule was applicable to determine the admissibility of hypnotically induced testimony by a defendant. *Id.* at 241. A closer reading of *Zani,* however, shows that, contrary to appellant's analysis, it should not be construed as holding that Texas adheres to the *Frye* standard.

Since *Zani* was a pre-Rules case, and the court did not address the issue of whether the *Frye* standard is applicable to post-Rules cases, and did not even use the *Frye* standard, we do not construe it as holding that Texas adheres to the *Frye* standard.

Conversely, in *Jones v. State,* 716 S.W.2d 142 (Tex.App.—Austin 1986, pet. ref'd) the Austin Court of Appeals applied the *Frye* standard to a pre-Rules case but noted the general criticism of *Frye* and the few and "unhelpful" *Frye* cases in Texas. *Id.* at 146. The Austin court concluded by urging the adoption of the relevancy standard. *Id.* at 154. We will apply the relevancy standard in the present case.

■ In the present case, we find the DNA evidence was reliable since expert testimony established the underlying scientific principle was valid, the technique applying the principle was valid, and the technique was properly applied for tests in this case. The State's five expert witnesses testified that the DNA identification process has gained a general acceptance in the scientific community in the particular field which it belongs. Appellant did not produce any expert testimony challenging the principles, procedures, and technology of the tests generally, nor did appellant produce any testimony challenging the particular test done in this case. In fact, the only defense expert, John Castle, did not disagree with the basic science and had no problems with the isolation of DNA.

The evidence before us shows that Lifecodes' procedures were confirmed by empirical validation. Studies had twice shown that Lifecodes made no mistakes and outside scientists had reviewed and verified both the procedures and the results.

The testimony presented above convinces us appellant's contentions are not valid that: (1) Lifecodes' procedures are unreliable; and (2) none of the State's experts demonstrated sufficient expertise in genetic statistics. We find Lifecodes' technique applying the underlying principle of DNA testing to be valid.

We are also persuaded by the State's argument that Lifecodes properly applied its technique for DNA testing on this particular occasion. Alan Guisti, along with his supervisor, Dr. McElfresh, testified the tests were performed in accordance with Lifecodes' procedures.

Because we find the DNA evidence in the present case was reliable due to the validity of the underlying scientific principle of DNA testing and Lifecodes' technique applying that principle on this particular occasion, the trial court did not abuse its discretion in overruling appellant's *Frye* motion and admitting the DNA evidence. Appellant's points of error one and two are overruled.

Appellant contends in his third point of error that without the DNA evidence, the evidence is insufficient to sustain the jury's verdict.

■ In the present case, the key issue was the identity of Teems' murderer. Since we hold the DNA evidence is relevant and, therefore, admissible, we find the evidence sufficient to show appellant was the

murderer. In any event, without the DNA evidence, the remaining evidence, as set forth in detail above, is still sufficient to sustain appellant's guilt.

Appellant presented two alternate hypotheses, that Teems was murdered after she won money playing bingo at a commercial bingo establishment, and that she was murdered by her daughter for Copeland's share in Teems' estate. The State clearly sets forth why the evidence does not support either of these hypotheses.

First of all, the only witness to testify as to the bingo hypothesis did not know Teems at all and based her initial identification on a newspaper photo. The identification was rebutted by two of Teems' long-time friends, who testified that Teems had never and would never have gone to a commercial bingo establishment. In addition, they stated Teems was extremely religious and belonged to a church that forbade gambling. The bingo hypothesis was also rebutted by testimony that no matter where Teems was going, she never would have voluntarily left the house in a mess and without a bra. The hypothesis does not explain the butcher knife or checkbook, the missing church money and .22 automatic, or the messed-up bed and semen stain. It also does not explain why appellant had sudden cash, Teems' truck which he knew to be "hot," and Teems' rings which he identified as "from an old lady" and which he later sold, all three hours after Teems was last seen alive.

The insinuation that Copeland murdered Teems was rebutted by testimony showing that Copeland was at a lounge the entire evening except for when she and a friend went to her son's house about 9:30 p.m. In addition, Teems' close friends testified that although Teems may have disapproved of Copeland's personal and financial life, the situation had gone on for years and was no different that October, and there was very little difference between Copeland's inheritance without a will or under the will that Teems intended to make but had been putting off indefinitely. Neither does this hypothesis explain the disheveled bed and semen stain indicating the presence of a male

of appellant's subgroup, since Copeland was a female and had had no sexual relationship with appellant since February, long before the purchase of the bedspread in May. We agree with the State that neither of these two hypotheses explain why appellant had extra cash, Teems' truck and rings.

In reviewing the sufficiency of the evidence in either a direct or circumstantial evidence case, we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim.App.1984); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App. 1984) (opinion on reh'g); *Wilson v. State*, 654 S.W.2d 465, 471–72 (Tex.Crim.App. 1983) (opinion on reh'g). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). However, a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Crim.App.1984); *Jackson*, 672 S.W.2d at 803.

In the present case, we find the DNA evidence is not necessary to show that appellant committed the crime. Since the non–DNA evidence set forth above clearly indicates that any rational trier of fact could have found appellant guilty of murdering Teems, appellant's third point of error is overruled.

█ In his final point of error, appellant complains the trial court erred in overruling appellant's motion for mistrial based on juror misconduct.

On Monday, November 21, 1988, during the trial of the instant case, it was brought to the trial court's attention that one of the jurors, Robert Charles Northington, had a conversation about the case with an attor-

ney not associated with the case, Robert J. Keffler. The trial court then called a hearing on juror misconduct.

During that hearing, Keffler testified that he had run into Northington, a long-time friend of his in the locker room of the Fort Worth Club. Keffler asked Northington where he'd been, and Northington replied that he was serving as a juror in a murder case and it looked like it was going to go on for awhile. He also said that it involved a genetic analysis of the defendant's semen. When Keffler asked him if the defendant's name was Trimboli, Northington said it was not. Keffler stated that Northington then said that: the jury was spending a lot of time outside the courtroom; he was learning a lot about biology; and the testimony that the defendant had an affair with the victim's daughter was an intriguing part of the case. There is no indication from the record, however, that Northington expressed an opinion about the affair or said anything else about the trial, including any defense of alibi or talking among the jurors about the case. In Keffler's opinion, no one else overheard the conversation.

Northington acknowledged the conversation, but denied any discussion of genetic testing or an alibi. He later remembered saying that it was a murder case, and not the Trimboli case, but one like it. He denied any specific mention of the semen stain. He recalled that the conversation was not loud enough for other people to hear, and no one spoke to him about the case or about what they had read in the newspaper. Northington had not read the newspaper since being sworn in as a juror, and he did not discuss with Keffler the defendant's right to testify or not testify, or any possible defense.

Later, on November 23, during jury arguments at the close of the guilt-innocence phase, the trial court reopened the hearing.

During that hearing, Randall Johnson, another Fort Worth attorney not associated with the case, testified that he was also a long-time friend of Northington. On Monday, November 14, he and Northington had just finished playing a volleyball game at the Fort Worth Club when Northington mentioned that he had been a juror for two weeks on a criminal case. Northington added that the State was using genetic or DNA evidence. Johnson stated that nothing else was said, no one else participated in the conversation, and Northington did not express any opinion of the case. Johnson claimed he did not give any information about the trial or its newspaper coverage to Northington.

At the conclusion of the hearing, the trial court denied appellant's motion for mistrial.

TEX.CODE CRIM.PROC.ANN. art. 36.-22 states:

No person shall be permitted to be with a jury while it is deliberating. *No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.*

TEX.CODE CRIM.PROC.ANN. art. 36.22 (Vernon 1981) (emphasis added).

■ The rule against jurors conversing with unauthorized persons about the case is so strong that injury to the defendant is presumed. *McMahon v. State,* 582 S.W.2d 786, 793 (Tex.Crim.App.1978) (en banc), *cert. denied,* 444 U.S. 919, 100 S.Ct. 238, 62 L.Ed.2d 175 (1979). This presumption is, however, rebuttable, and the verdict will be upheld if the State shows that the case was not discussed or that nothing prejudicial to the defendant was said, so that there was no injury to the defendant. *Id.*

■ Here, we find that most of Northington's comments did not concern appellant's specific case at all. He told Keffler that: he was a juror; it was a murder case; the trial was going to go on for awhile; and the jury was spending a lot of time outside the courtroom. He told Johnson that he had been a juror for two weeks and it was a criminal case. Since these comments did not constitute conversations about appellant's specific case, we find there was no injury to appellant. *See Chambliss v. State,* 647 S.W.2d 257, 266 (Tex.Crim.App.1983) (en banc) (request for address); *Romo v. State,* 631 S.W.2d 504,

**588**

506 (Tex.Crim.App. [Panel Op.] 1982) (fact of jury duty); *Williams v. State*, 463 S.W.2d 436, 440 (Tex.Crim.App.1971) (duration of trial); *Kingsley v. State*, 744 S.W.2d 191, 194 (Tex.App.—Dallas 1987), *pet. ref'd per curiam*, 784 S.W.2d 688 (Tex.Crim. App.1990) (en banc) (duration of trial).

Since the trial court denied appellant's motion for mistrial following Northington's testimony, it should be presumed that the trial court reconciled any conflict in the testimony in favor of Northington and found that he did not discuss the specifics of appellant's case. *See Bratcher v. State*, 771 S.W.2d 175, 190 (Tex.App.—San Antonio 1989, no pet.); *Fielder v. State*, 683 S.W.2d 565, 582 (Tex.App.—Fort Worth 1985), *overruled on other grounds*, 756 S.W.2d 309 (Tex.Crim.App.1988). Although injury is presumed even if an exchange does not rise to the level of a full-blown discussion of the specifics of a given case, *McIntire v. State*, 698 S.W.2d 652, 659 (Tex.Crim.App.1985), the purpose of article 36.22 is to prevent an outsider from saying something that might influence a juror. *Chambliss*, 647 S.W.2d at 266. Therefore, the presumption of injury can be rebutted by a showing that the person the juror talked to either had no knowledge of the case or gave no information about the case to the juror. *See McIntire*, 698 S.W.2d at 659 n. 13. Because the evidence shows Northington did not talk to any person who had knowledge of or gave him information about the case, and nothing prejudicial to appellant was said, we find there was no injury to appellant. *Id.* Appellant's fourth point of error is overruled.

An amicus brief has also been submitted to this court which attempts to add complaints about all DNA testing, the general qualifications of the State's experts, the lack of validation of Lifecodes' procedures, and Lifecodes' failure to use a multi-locus probe. We choose to disregard these complaints since an amicus curiae brief may not challenge the validity of testimony in the record, *Booth v. State*, 499 S.W.2d 129, 136 (Tex.Crim.App.1973), and may not raise a point of error not asserted by the defendant. *International Bhd. v. Missouri Pac. Freight Transp. Co.*, 220 S.W. 219,

253 (Tex.Civ.App.—Beaumont 1949, writ ref'd n.r.e.).

The judgment of the trial court is affirmed.