Ronald Steven **TRIMBOLI**, Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 10–89–081–CR to 10–89–083–CR.

Court of Appeals of Texas, Waco.

Oct. 2, 1991.

Discretionary Review Granted Jan. 8, 1992.

Pamela J. Moore, Moore & Moore, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Fort Worth, C. Chris Marshall, Betty Marshall, Robert Gill and Alan Levy, Asst. Crim. Dist. Atty., Fort Worth, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

On a summer evening in 1985, Joann Lemieux[1] came home from work and discovered the bodies of her two daughters, Renee, age 12, and Danielle, age 14, and a young man who had been staying with them, John Bradley, age 17. All had been bound, gagged, and stabbed to death. Danielle had been sexually assaulted. In a single trial, a jury convicted Appellant of murdering the youths and assessed him three consecutive life sentences. *See* Tex.Penal Code Ann. § 19.02 (Vernon 1989). He appeals, complaining that the court erroneously admitted deoxyribonucleic acid (DNA)[2] "fingerprinting" tests and test results, that the evidence was insufficient to support the jury's verdict, and that the court improperly excluded admissible evidence. We will affirm the judgment.

The State relied in part on DNA evidence to obtain the convictions. Appellant had attempted to suppress this evidence by filing a motion to exclude evidence of DNA genetic "fingerprinting" tests and test results, but the court admitted the evidence after conducting an exhaustive pretrial hearing on the motion. Essentially, at trial, the State's experts testified that the DNA in seminal stains found at the crime scene "matched" the DNA obtained from a sample of Appellant's blood.

Two types of DNA tests were performed in this case. One test used the restriction fragment length polymorphism (RFLP) technique and the other test used the polymerase chain reaction (PCR) technique. The RFLP technique is more sensitive than the PCR technique. R. Gill & J. Middleton, *DNA: TESTING, EVIDENCE AND TRIAL,* in Annual Criminal Law Update Conf. (1989). In RFLP testing, the uniqueness of an individual's DNA is exploited by chopping the DNA molecule at known points with a restriction enzyme which results in a series of restriction fragments. *Id.* The length or molecular weight of the restriction fragment varies from individual to individual, and this variation is detected through the use of radioactive probes designed to bind to a known sequence of DNA. *See id.* An autoradiogram, or x-ray, is made of the locations at which the probes bind, and then the probes are compared to determine if a "match" exists between the suspect's DNA and the evidentiary DNA. *Id.* The RFLP technique requires a comparatively large amount of DNA in the forensic sample to render an interpretable result. *Id.* Because the PCR technique is designed to determine the genotype of a given DNA sample from a comparatively small sequence of DNA, it is the preferred method where the forensic DNA sample is either very small or very degraded. *Id.* This technique is not as sensitive as the RFLP technique because it works with only one sequence of DNA. *Id.* Although Appellant's pretrial motion technically covered the PCR technique, as well as the RFLP technique, his complaints in his first two points of error focus on the RFLP test, the test that, according to the State's experts, showed a match between Appellant's DNA and the evidentiary DNA. In his third point, Appellant contends that because a reasonable explanation exists for all of the evidence other than the "DNA print evidence"—which we interpret to mean the results of the RFLP test—the evidence was insufficient to support the jury's verdict. We disagree. We will hold later that the RFLP DNA evidence was admissible at trial, and, although this evidence alone is incriminating, the other evidence combined with it seals Appellant's conviction.

---

**1.** After the date of the murders, Mrs. Lemieux remarried. At the time of trial, her name was Joann Carley. We will refer to her hereinafter as Mrs. Carley.

**2.** DNA, the molecule that carries the body's genetic information, is found in every cell with a nucleus in every living organism. *Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436, 438 (1990).

It is an individual's most characteristic feature. Other than identical twins, no two people have the same DNA sequential pattern. *Id.* 393 S.E.2d at 439. Using DNA as a forensic identification technique, including the scientific principles and methodology used to determine whether DNA samples match in the application of the RFLP test, is thoroughly discussed in the *Caldwell* opinion. *See id.*, 393 S.E.2d at 437–41.

The standard of review for challenges to sufficiency claims is whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989); *Carlsen v. State*, 654 S.W.2d 444, 448 (Tex.Crim.App. 1983) (on rehearing). An identical standard is applied to sufficiency challenges involving circumstantial evidence cases. *Carlsen*, 654 S.W.2d at 449. In applying this standard, if the reviewing court finds that there is a reasonable hypothesis other than the guilt of the accused, then it cannot be said that guilt has been shown beyond a reasonable doubt. *Turner v. State*, 805 S.W.2d 423, 427 (Tex.Crim.App.1991); *Johnson v. State*, 673 S.W.2d 190, 195 (Tex. Crim.App.1984).

Appellant was no stranger to the Lemieux family. His step-daughter, Hope, and Renee were best friends. He and his family lived down the street from the Lemieuxs' two-bedroom, one-bath duplex. However, Mrs. Carley described Appellant as an "acquaintance," and she testified that, other than during the early morning hours on the day of the murders, Appellant had never before been in her home. Appellant first went to the Lemieuxs' home at 2:00 a.m., requesting to use the telephone to call a doctor about his sick baby. He claimed that his telephone was out of order. When Appellant entered the home, he acted erratically and seemed agitated when he saw John Bradley sleeping on a sofa bed in the living room. He was very nervous and was sweating profusely, and Mrs. Carley gave him a glass of water. While waiting for the doctor to return his call to the answering service, Appellant learned from Mrs. Carley that she would be gone that day from 7:00 a.m. until 11:00 p.m. At one point, he asked to use the bathroom. He slammed the bathroom doors and was gone a long time, but Mrs. Carley never heard him use the bathroom or flush the toilet. When the doctor called, he told Appellant to give the baby liquid aspirin and to bring him to the doctor's office at 8:00 a.m. Appellant returned at 5:30 a.m., asking again to use the telephone. He seemed very nervous and admitted to Mrs. Carley that he had not given the baby any aspirin. When the doctor returned Appellant's call, he again told Appellant to bring the baby in at 8:00 a.m. Appellant did not go into the kitchen or the utility room during either of his two visits to the duplex.

Mrs. Carley tried to reach her daughters by telephone the day of the murders, but no one answered. She left work an hour early because she was worried about them. When she arrived home at 10:30 p.m., she discovered Renee's body on the bathroom floor. She then went into the living room and called the police. After help arrived, she went into her bedroom and found Danielle's body lying on the bed. Police officers found John Bradley's body in the utility room. They also found a glass sitting on top of the dryer in the utility room, a different glass than the one Appellant had been given at 2:00 a.m.

The FBI compared Appellant's fingerprints with those found in the Lemieuxs' home and found that Appellant's palmprint was on the washer, two of his palmprints were on the dryer, one of his fingerprints was on the freezer door, and, along with four of John Bradley's fingerprints, nine of his fingerprints were on the glass that was found on the dryer.

Appellant visited the police department for three separate interviews. During the first interview, he explained his visits to the Lemieuxs' home to use their telephone. He claimed that he had never been in any rooms of the duplex besides the kitchen, the living room, and the dining room. He specifically stated he had never been in the bedrooms, bathroom, or utility room. Although Appellant stated in his first interview with the police that on the morning of the murders he took his baby to the doctor's office at 8:30 a.m., he actually took the baby between 11:15 and 11:45 a.m. During a second interview with the police a few days later, Appellant again denied ever being in the bedrooms, bathrooms, or utility room or ever touching the washer or

dryer. After he was told during this interview that his fingerprints and palmprints had been found, he became "very mad" and started shaking and raising his voice, still denying that he had ever been in the utility room or touched the washer, dryer, or glass. Appellant came back the next day for a third interview. This time he said that the doctor's appointment was at 9:00 a.m. instead of 8:30 a.m. and that he had taken a tour of the Lemieuxs' home "within the last three months." He insisted again, however, that he had never touched the washer or dryer.

Appellant's wife and step-daughter, Hope, testified that Appellant had volunteered to fix the Lemieuxs' washer and dryer two to three weeks before the murders, but Mrs. Carley testified that she had cleaned the washer and dryer two days before the murders, and the FBI print expert testified that heat and humidity shorten the life expectancy of fingerprints.

Other incriminating evidence was: (1) Appellant's doctor, who saw the baby on the morning of the murders, testified that nothing appeared to be wrong with the baby; (2) a witness testified that about two weeks before the murders she saw Appellant with his arms around Danielle, who was trying to get away from him; (3) no "trouble report" was ever made to the telephone company about his telephone being out of service, and his telephone service was not suspended for failure to pay his bill until *after* the murders; (4) although not identified as human blood, small droplets of blood were found on the sleeves of one of Appellant's shirts; (5) a standard serology test showed that the semen stains on the bedspread where Danielle's body was found came from a person with a blood protein subgroup PGM 1 + 2 + (Appellant is one of 22% of the population with this PGM type); (6) the DNA test using the PCR technique, which Appellant does not specifically complain about, was performed on the seminal stains and showed that Appellant is in a group of just over 3% of Caucasians who have a DQ alpha type of 1.1,2, the same DQ alpha type which was found on all of the bedspread stains; (7)

the probability of a PGM 1 + 2 + male having a DQ alpha type of 1.1,2 is 22% times 3%, or .66%. Therefore, even excluding the RFLP DNA test results which Appellant finds objectionable, the evidence shows him as being one of less than 1% of the male population who could have left the semen on the bedspread.

In his brief, Appellant maintains that "the testimony elicited at trial provides a reasonable explanation for the presence of all the evidence other than the DNA evidence." The doctor did testify that the baby's condition could have changed by the time he saw the child, and Hope did testify that construction in the area had affected their phone service at the time of the murders. However, no reasonable explanation exists for Appellant's prints found on the washer, dryer, and glass sitting on the dryer. No reasonable explanation was provided for the blood stains found on his shirt, for having his arms around Danielle when she was trying to get away, or for waiting to take his baby to the doctor after 11:00 a.m. Additionally, Appellant did not attempt to rebut the testimony showing his inclusion in a group consisting of less than 1% of the male population who could have left the semen stains.

Appellant has not provided, nor can we conceive, a reasonable hypothesis other than his guilt. *See Turner*, 805 S.W.2d at 427. We believe that, based on this evidence alone, any rational trier of fact could have found that Appellant intentionally and knowingly caused the deaths of the youths. *See Butler*, 769 S.W.2d at 239; Tex.Penal Code Ann. § 19.02 (Vernon 1989). We overrule point three.

■ The RFLP DNA test was performed by Lifecodes Corporation of New York. Expert witnesses testified that Appellant's DNA matched the bedspread semen, or evidentiary, DNA and that the frequency of the occurrence of this particular DNA in the North American Caucasian population was one in 54 billion. Appellant maintains that this testimony should never have been admitted. He insists, in point one, that the court erred in denying his motion to exclude the evidence of the DNA genetic

"fingerprinting" tests and test results because the standard used to determine whether a match occurred in the RFLP test did not meet the requirements of either the *relevancy* test or the *Frye* test. *See Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923); *Kelly v. State,* 792 S.W.2d 579, 584 (Tex.App.—Fort Worth 1990, pet. granted). The *Frye* test and the *relevancy* test are the two evidentiary standards used by courts to determine the admissibility of evidence based on a novel scientific technique. *Kelly,* 792 S.W.2d at 584. Under the *Frye* standard, expert testimony based on a novel scientific technique is admitted if the underlying principle and the technique are generally accepted in the relevant scientific community. *Id.* We agree with the court in *Kelly* that the relevancy test, derived from Rules 401, 402, and 702 of the Rules of Criminal Evidence, is the proper standard for determining the admissibility of scientific evidence.[3] *See id.; see also Bethune v. State,* 1991 WL 170217, No. 14–90–970–CR, slip op. at 3 (Tex.App.—Houston [14th Dist.] 1991, no pet.). The court in *Kelly* applied the relevancy standard in determining the admissibility of DNA evidence and held that the *Frye* standard is consistent with the *relevancy* standard. *Id.* at 584–85; TEX.R.CRIM.EVID. 401, 402, 702; *see also* 33 S. GOODE, O. WELLBORN & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 702.5 (Texas Practice 1988) (providing: "[I]f the court determines that the lack of general scientific acceptance betokens a lack of reliability, the court may well find that the proffered scientific evidence will not assist the factfinder and is therefore inadmissible under Rule 702. Alternatively, the court may conclude that its probative value is substantially outweighed by the danger that it will confuse, mislead, or unfairly prejudice the jury, and that the evidence is excludable under Rule 403.") As Judge Mark McCormick states in his comprehensive article on the admissibility of scientific evidence:

An advantage of traditional analysis under relevancy and expert testimony rules is that the conditions for admissibility can be tailored to suit the characteristics of the technique and the impact of the evidence in the case. The rigor of the requisite foundation can be adjusted to suit the nature of the evidence and the context in which it is being offered.

Eliminating the general acceptance test does not make scientific evidence automatically admissible on the say-so of a single expert. Subject to limitations imposed by positive law, precedent, and judicial review, the trial court has the right to assess the strength of the foundation for admissibility. That includes the right to know the accuracy and reliability of the technique on which the evidence is based. When the error rate is unknown, undisclosed, or unreasonably high, the trial court is justified in excluding the evidence. Lack of consensus in the scientific community concerning this factor may lead the trial or appellate court to conclude that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice because of the uncertainty concerning the evidence's trustworthiness. In appropriate cases the court may well consider the lack of consensus in the scientific community as a factor that bears heavily on the admissibility decision.

. . . . .

Within the framework of traditional relevancy and expert testimony standards, a number of specific factors should be considered in determining the admissibility of novel scientific evidence. Factors that should be taken into account include:

(1) the potential error rate in using the technique,

(2) the existence and maintenance of standards governing its use,

(3) presence of safeguards in the characteristics of the technique,

---

3. We note that the Court of Criminal Appeals has granted the petition for discretionary review in *Kelly.* For the reasons set forth in *Kelly,* we believe that the Court of Criminal Appeals will adopt the relevancy standard.

(4) analogy to other scientific techniques whose results are admissible,

(5) the extent to which the technique has been accepted by scientists in the field involved,

(6) the nature and breadth of the inference adduced,

(7) the clarity and simplicity with which the technique can be described and its results explained,

(8) the extent to which the basic data are verifiable by the court and jury,

(9) the availability of other experts to test and evaluate the technique,

(10) the probative significance of the evidence in the circumstances of the case, and

(11) the care with which the technique was employed in the case.

These factors require examination of the characteristics of the evidence, the foundation for the proffer, and the context of the proffer.

McCormick, *Scientific Evidence: Defining a New Approach to Admissibility,* 67 Iowa Law Review 879, 910–12 (1982). When scientific evidence is subjected to such an analysis, "rejecting the *Frye* standard does not automatically signal abandonment of caution." *Id.* at 914.

 In general, expert testimony is admissible under the *relevancy* standard if the witness is qualified as an expert, the testimony will assist the jury, and the probative value of the testimony is not substantially outweighed by its prejudicial effect. *Kelly,* 792 S.W.2d at 584; Tex. R.Crim.Evid. 401, 402, 702. The burden of proof is on the proponent of the evidence to establish the predicate facts by a preponderance of the evidence, and the trial court's decision will not be overturned absent an abuse of discretion. *Kelly,* 792 S.W.2d at 585. The reliability of scientific evidence depends upon (1) the validity of the underlying scientific principle, (2) the validity of the technique applying that principle, and (3) the proper application of the technique on a particular occasion. *Id.* at 584.

 Appellant's motion complained that the procedures, tests, and results (1) were not scientifically valid and did not possess the requisite accuracy and reliability for admissibility in a criminal case, (2) were not generally accepted in the scientific community, (3) were not relevant and any probative value was outweighed by the prejudicial value, and (4) would usurp the factfinding function of the jury. On appeal, Appellant admits that the principles of DNA profiling are "probably" generally accepted in the scientific community and that the "methods employed in this technique" are commonly used and well accepted in the scientific community; he does not even contend that the application of these methods was improper. He claims, however, that the *interpretation* of the results obtained by these methods is not accepted by the scientific community.

At the hearing on Appellant's motion to exclude the DNA evidence, the State called three witnesses and Appellant called one. The State's first witness was Dr. Phil Hartman, an associate biology professor at Texas Christian University. Dr. Hartman, a member of the Genetic Society of America, the American Society of Photobiology, the American Association for the Advancement of Science, as well as other professional societies, testified that, if the RFLP test shows matching DNA bands, then the test has been performed correctly because any error in conducting the test would result in no match, not a false match. Dr. Hartman said that he had no economic interest in Lifecodes and that the procedures in DNA testing are accepted scientific techniques. *See Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436, 437–41 (1990).

Dr. Kevin McElfresh, assistant director of the laboratories at Lifecodes, testified that Lifecodes took its first forensic cases in 1986 and that, besides Lifecodes' own internal testing, it made no mistakes in its participation in "blind trials" in which the California Association of Crime Lab Directors tested Lifecodes by submitting 125 coded samples. He explained the steps of the RFLP test and testified that each step was well-known and well-accepted in the scientific community. He also explained

that whether samples "match" is determined *visually* by the scientist performing the test. Then, Dr. McElfresh double-checks the test himself.

Dr. Edward Blake, a forensic serologist and a partner in a private physical evidence consulting firm, Forensic Science Associates, testified that two problems that can arise in a RFLP test are (1) allelic dropout, in which alleles of high molecular weight do not appear in a partially-degraded sample, and (2) band shifting, in which the entire pattern of bands in a certain sample is shifted. Dr. Blake explained, however, that these problems will not result in a false match if the analyst is knowledgeable. Dr. Blake also talked about the PCR test and explained that all the steps in performing the PCR test are well-known and well-accepted in the scientific community.

Dr. Moses Schanfield, laboratory director of Allo–Type Genetic Testing in Atlanta, Georgia, testified for the defense. He testified that he had no problems with the steps of the RFLP test. Although Dr. Schanfield explained some of the problems which can arise with RFLP testing, Appellant has not directed us to, nor do we find anywhere in his testimony at this hearing, any evidence to support Appellant's suggestion that the RFLP test is unreliable because the "definition of a 'match' " between evidentiary DNA and a defendant's DNA is the subject of a "crucial controversy."

Applying the relevancy standard to the record before us, we hold that the State met its burden: it presented witnesses qualifying as experts in DNA testing; it elicited testimony which would assist the jury—DNA testing which shows the probability of a defendant's DNA being the same as the evidentiary DNA; and it showed that the DNA evidence's probative value— the results of a test from a scientifically valid principle and applied technique—outweighed any prejudicial effect. *See id; see also Vickers v. State*, 801 S.W.2d 214, 216 (Tex.App.—Beaumont 1990, no pet.) (holding that the "relevancy of locating [the defendant's] genetic material within the victim's body cavity is undeniable"). Therefore, the court did not abuse its discretion in denying Appellant's motion to exclude the DNA evidence. We overrule point one.

■ In Appellant's second point, he asserts that the court erred in admitting evidence of the RFLP DNA test and test results because a "visual match" of DNA samples is inherently unreliable and because the evidence regarding the statistical probability of a random match was erroneously admitted. He stresses in this point that Lifecodes did not follow its own protocol in determining that Appellant's DNA matched the evidentiary DNA. For several reasons we will overrule this point.

First, at the hearing on Appellant's motion to exclude the DNA evidence, he did not specifically complain that Lifecodes' determination of a match in this case was unreliable because it was made visually. Other than chain-of-custody objections, Appellant's objections to DNA evidence admitted at trial were for "reasons ... articulated outside the presence of the jury." The reasons given outside of the jury's presence were those contained in his motion to exclude, which did not assert that the DNA evidence should be excluded because the visual match did not conform to Lifecodes' own procedure. Therefore, because no objection or motion to strike, stating specific grounds, appears in the record, Appellant has waived this complaint. *See* TEX.R.CRIM.EVID. 103(a)(1); TEX.R.APP.P. 52(a).

Second, assuming Appellant had made a proper objection, applying the relevancy standard once more, we hold that the court did not abuse its discretion in admitting the DNA evidence. *See Kelly*, 792 S.W.2d at 584–85; TEX.R.CRIM.EVID. 401, 402, 702. Appellant claims in this point that Lifecodes' publications in peer-review literature expressly define its match criteria "to include both a visual initial assessment and a subsequent molecular band sizing such that a difference of more than three standard deviations would result in a non-match." Defense witnesses testified that the difference between Appellant's DNA and the evi-

dentiary DNA exceeded three standard deviations and that, therefore, according to Lifecodes' own criteria, no match occurred. However, prosecution witnesses testified that a visual assessment of the autoradiograms is proper and that the slight variation between Appellant's DNA and the evidentiary DNA was due to a band shift. *See Caldwell*, 393 S.E.2d at 439–43 (giving explanation of band shift). They also testified that molecular band sizing for determining standard deviations is used in comparing "ideal or pristine samples"—like those analyzed in paternity cases—not forensic samples, which have often suffered some degradation. McElfresh, of Lifecodes, explained that a match is made visually and that the standard deviation measurements in forensic cases are used to attach numbers to bands that *already match* to determine the frequency of the match in the population. In surrebuttal, the State presented Dr. James Womack, a mammalian geneticist at Texas A & M University, who testified that a visual match was scientifically acceptable.

The Supreme Court of Georgia has held that the declaring of a visual match is scientifically acceptable where the visual observation is confirmed by a scientifically acceptable test for determining band shift.[4] *See Caldwell*, 393 S.E.2d at 443. Unlike the defense in *Kelly*, Appellant did attempt, through the testimony of his witnesses, to show that the DNA evidence was inadmissible. *See Kelly*, 792 S.W.2d at 585. Several of Appellant's witnesses, who were well-qualified to testify, stated that Lifecodes was wrong in declaring a match. However, the State countered Appellant's complaints by showing that Lifecodes followed its own procedure and that the evidence of a match was reliable—that the scientific principle was valid, that the technique applying the principle was valid, and that the technique was properly applied.

Because the State met its burden, we hold that the court properly admitted the evidence of the DNA match under the relevancy test. *See id.* at 585. The conflicting testimony on Lifecodes' declaration of a match affected only the weight of the evidence and not its admissibility. Apparently, the jurors were either persuaded by the State on this issue or believed that all of the other evidence was sufficient to convict. (See our discussion of point three.)

Third, the test conducted by Lifecodes was ultimately shown to have scientific validity through the testimony of Appellant's own witness. Trying to determine if the RFLP test had been performed properly, Appellant sent a fake paternity test to Lifecodes through Dr. James Geyer, Director of Genetic Design, Inc., a paternity-testing laboratory in Greensboro, North Carolina. His paternity-test DNA matched the evidentiary DNA better than his original-test DNA. In fact, using the criteria that Appellant insists Lifecodes should have used, the paternity DNA matched the evidentiary DNA within three standard deviations. Dr. Geyer testified that, under Lifecodes' criteria, a match existed between the paternity DNA and the evidentiary DNA. Therefore, through Appellant's own witness, a match was proven using the criteria that Appellant maintains should have been used in the original test. We overrule point two.

■ Appellant complains in his final point that the court erred in excluding the testimony of Officer Mike Bosillo, whose testimony was preserved in a bill of exceptions. Appellant correctly points out that Rule 803(8)(C) of the Rules of Criminal Evidence allows, as an exception to hearsay, a report to be used against the state if it contains "factual findings resulting from an investigation made pursuant to authority granted by law" and the sources of

---

4. Lifecodes used a non-polymorphic (or monomorphic) probe—the probe for the Y chromosone—which was an "internal control" for the test. Dr. C. Thomas Caskey, who oversees a medical diagnostic laboratory which uses DNA as the method for diagnoses, explained that "you can equate any distortion of migration to the monomorphic probe" in determining "a true migration problem" or a "difference in genetic characteristic[s]." Dr. Caskey believed that the shift in the forensic test was probably the result of some partial degradation of the semen DNA. Appellant's witnesses who calculated the band sizing which fell outside of the three standard deviations made no adjustment or correction for the Y–shift.

information or other circumstances do not indicate a lack of trustworthiness. *See* Tex.R.Crim.Evid. 803(8)(C).

Although Officer Bosillo did not have a report with him during his testimony, the defense questioned him from a report. Officer Bosillo testified that he had a discussion with Eddie Falcetta who mentioned two brothers named Jimmy and Joel Mixon and a conversation between them concerning the "Veteran's Park" murders. As a result of this discussion, a "dope buy" was arranged between an undercover police officer and the Mixons. During the subsequent arrest from the "dope buy," police officers found a "murder mystery" map, but Officer Bosillo testified that he could not recall ever seeing the map. Appellant asked Officer Bosillo about an interview he had with the Mixon brothers. Officer Bosillo testified that he did not remember a conversation with them about Robert Coleman telling a girl named Renee that he was involved in a triple homocide, although Officer Bosillo stated, "if those are my notes, that's accurate." Officer Bosillo explained that he visited Coleman to discuss the murders in this case, that he was told Coleman would not discuss the matter without a lawyer present, and that he did not follow up with any further investigations of Coleman about the murders in this case because his "primary concern" was a different murder case and he had nothing to "tie [Coleman] into any other murders that ... could be corroborative."

Proffered evidence which may be admissible as an exception to hearsay must *still* be relevant. Rule 401 of the Texas Rules of Criminal Evidence provides that evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R.Crim.Evid. 401. None of Officer Bosillo's testimony tended to make any fact that was of consequence to this case more or less probable. *See id.* Further, the only evidence which might have been remotely relevant—the portion of the report (although Officer Bosillo did not remember it) concerning the interview with the Mixon brothers about Coleman telling a girl named Renee that he was involved in a triple homocide—would not have been admissible, even if relevant, because it was hearsay within hearsay which did not fall within any hearsay exception. *See Crane v. State*, 786 S.W.2d 338, 354 (Tex.Crim. App.1990). We overrule Appellant's last point.

We affirm the judgment.