**Robert Reginald SPRINGFIELD,
Appellant (Defendant),**

**v.**

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–162.**

Supreme Court of Wyoming.

Sept. 21, 1993.

Leonard D. Munker, State Public Defender, Cheyenne, Gerald M. Gallivan, Director, R. Daniel Fleck, Student Intern, and Ryan R. Roden, Student Intern, Defender Aid Program, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., Mary Beth Wolff, Asst. Atty. Gen., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

GOLDEN, Justice.

Robert Reginald Springfield appeals a judgment and sentence imposed for the commission of first degree sexual assault in violation of WYO.STAT. § 6-2-302(a)(i) (1988). We affirm.

This appeal presents issues concerning the admissibility of deoxyribonucleic acid (DNA) evidence and statistics accompanying a declared match of DNA samples. We will begin by relaying the facts surrounding this crime and the course of procedure in this case. We will then discuss the scientific background of DNA profiling in brief as well as the specific techniques used to develop appellant's DNA profile and database comparison statistics. We will look next to the legal standards of admissibility and whether the trial court abused its discretion in admitting this evidence. Finally, we will address the lesser issues raised by appellant.

## ISSUES

Appellant presents the following issues on appeal:

I. Did the trial court err by admitting DNA profiling evidence without proper foundation as to the statistical significance of a DNA match?

II. Did the court err when it failed to determine if the laboratory protocols were complied with prior to allowing the jury to be exposed to unfairly prejudicial evidence?

III. Was the evidence insufficient to sustain a conviction when the DNA evidence was improperly admitted, was the only evidence linking appellant to the crime, and the victim could not identify the assailant?

IV. Under the plain error doctrine, was it reversible error for the trial court to admit any evidence regarding the camera, when the prosecutor did not prove that the appellant had any connection with the camera, and such evidence unfairly prejudiced appellant, denying appellant a fair trial?

V. Was appellant's right to a speedy trial as provided for by the Wyoming and United States Constitutions violated, when the criminal complaint was filed on May 9, 1991, but appellant did not go to trial until April 27, 1992?

VI. Did errors at trial amount to cumulative error, requiring reversal of appellant's conviction?

The state responds with the following issues:

I. Did a sufficient foundation exist for proper introduction of DNA evidence?

II. Was appellant's right to speedy trial violated?

III. Did appellant receive a fair trial?

## FACTS

On the evening of April 9, 1988, as Beverly Pilch opened her back door to retrieve her dog, a masked man, wearing a stocking cap and brandishing a knife, entered her Sheridan home. Seeking cash and finding none, the intruder sexually assaulted Mrs. Pilch while holding the knife to her throat, then tied her hands and feet together and fled. Mrs. Pilch was eventually able to summon police and was taken to the hospital where her clothing and fluid samples from her body were gathered as evidence of the rape and sent to the Wyoming Crime Lab in Cheyenne for analysis. On June 12, 1990, this evidence and a blood sample from the victim were sent to the FBI lab for DNA examination.

Later on the same night as the sexual assault, Sheridan police were notified of a break-in, one and a half blocks from Mrs. Pilch's residence, where a 35 millimeter camera, lenses and a carrying case were reported missing. The camera owner was able to report the serial numbers of the camera and a lens to the police.

In 1991, pursuant to a search warrant, blood, saliva and hair samples were collected from appellant and forwarded to the Wyoming Crime Lab and then to the FBI for DNA testing. Appellant's heritage is comprised of three-fourths Native American ancestry from the Crow tribe and one-fourth from the black race.

On May 9, 1991, a complaint and warrant for appellant's arrest were filed. Sometime between May 9 and appellant's initial appearance before the court on May 31, 1991, appellant was arrested, though the record is silent on the exact date. On June 7, 1991, appellant waived his preliminary hearing. On June 13, 1991, an information was filed charging appellant with first degree sexual assault in violation of Wyo. Stat. § 6–2–302(a)(i); appellant was arraigned the same day and trial was set for August 5, 1991. Bail was set at $75,000 and appellant was incarcerated on June 11, 1991, for failure to make bail.

On July 25, 1991, the state filed a motion for a continuance because the FBI examiner who conducted the DNA testing would not be available on the trial date. On July 29, 1991, an order was issued resetting trial for October 15, 1991. On August 8, 1991, the court reduced appellant's bond to $50,-000. Appellant filed a motion on September 19, 1991, to exclude introduction of DNA evidence as being more prejudicial than probative. A hearing was set to hear the motion on September 26, 1991, but appellant withdrew his motion on that date. Appellant made bail on October 7, 1991, and the state again moved for continuance to allow DNA testing of appellant's brothers, which would take an additional six to eight weeks. Trial was reset for January 13, 1992.

On January 3 and 30, 1992, appellant moved to exclude testimony of Dr. Patrick Conneally who was to be a DNA witness for the state, because he was not on the state's original witness list and because of serious doubts as to the reliability of the FBI's statistical method. A hearing on these motions was finally held April 14 and 16, 1992. Dr. William Shields, professor of biology at the State University of New York, College of Environmental Science and Forestry in Syracuse, New York, testified for appellant; Dr. Conneally, distinguished professor of medical genetics and neurology at Indiana University School of Medicine, testified for the state.

On April 22, 1992, the district court issued an order denying appellant's motion to disallow use or reference to DNA testing, finding:

1) That the principles underlying the DNA–RFLP procedure utilized by the FBI are generally accepted in the scientific community.

2) That the technique utilized by the FBI in conducting DNA profiling is conducted pursuant to standard procedures, and those procedures and techniques are generally accepted and considered reliable in the scientific community.

3) That the FBI adhered to those procedures in conducting the DNA profiling in this case.

4) That the results of the DNA profiling and statistical analysis are probative.

5) That the probative value of the evidence outweighs the danger of any unfair prejudice, confusion of issues, misleading of the jury, or undue delay, waste of time, or needless presentation of cumulative evidence.

Appellant's trial was held on April 27, 1991. In opening statement to the jury, the prosecutor indicated that the state would offer evidence that linked appellant to possession of the stolen camera and lenses. However, a trial witness for the state testified that he bought the camera from an unknown hitchhiker near Great Falls, Montana, and the court refused to admit any additional testimony regarding the camera, ruling it hearsay.

Before the trial, Mrs. Pilch had not been able to identify her attacker from a photo lineup. However, at trial, she was able to recall the attacker's brown eyes, dark skin, that he was fairly young, kind of muscular and that he was a little bit taller than her while she was wearing high heels.

Audrey Lynch, special agent with the FBI, testified that she conducted DNA analysis of blood samples from appellant and victim. She also analyzed stains on the panties and anal swabs taken from the victim. From these samples, through a process known as restriction fragment length polymorphism (RFLP), autoradiographs (autorads) were generated and then compared. Lynch found that the stain on the panties and anal swabs taken from the victim on which sperm had been identified matched appellant's blood sample on four different sets of two bands shown on the autorads. Lynch concluded a visual DNA match existed between appellant and forensic samples from the victim. A computerized check confirmed the match, using a match criteria of plus or minus 2.5 percent.

Autorads were prepared from samples of three of appellant's brothers and compared to the autorads generated from the forensic samples of the victim. The results determined an absolute exclusion of the brothers, though the probability of a match between siblings is one in 256.

Upon concluding that a DNA match existed between appellant and the forensic samples from the victim, Lynch then determined the statistical probabilities of such a match occurring when compared to an Indian population database. Approximately 200 Indians comprised the FBI database, including 100 Sioux, and members of the Navajo, Cherokee and Cheyenne tribes. No Crow tribal members were represented in the database. The probability of another Indian person having the same DNA as appellant was estimated to be one in 250,000 persons. Appellant's counsel objected to the introduction of statistical evidence because of the absence of Crow tribal members in the database. Lynch also developed probability statistics using other FBI databases and determined the following estimates: for the black database, one in 150,000,000; for the Caucasian database, one in 250,000,000; for the Hispanic database, one in 25,000,000.

The videotaped testimony of Dr. Conneally and Dr. Shields from the hearing on admissibility of DNA was entered into evidence at appellant's trial.

Appellant was found guilty, sentenced to serve not less than ten nor more than thirty years and ordered to pay restitution to the victim. He was given credit for 179 days of incarceration before trial and now pursues this appeal.

## DISCUSSION

*DNA Issues*

We address first the issues regarding the admissibility of DNA profiling evidence and probability statistics of the database populations. In considering an appellant's questioning the admissibility of expert testimony, we recognize that

[t]he decision of the trial court to admit or reject expert testimony is a decision solely within the sound discretion of the trial court and will not be reversed without a showing of clear and prejudicial abuse.

*Betzle v. State*, 847 P.2d 1010, 1022 (Wyo. 1993). *See also, Triplett v. State*, 802 P.2d 162, 166 (Wyo.1990); and *Braley v. State*,

741 P.2d 1061, 1064 (Wyo.1987). In *Oien v. State*, 797 P.2d 544, 549 (Wyo.1990), this court said the standard of review for challenging the "admissibility of evidence on grounds of relevancy is abuse of discretion and the burden of establishing such abuse lies with the challenger."

We begin by describing in brief the process of DNA profiling and the method used by the FBI to develop statistical reference. Many courts have now addressed this issue and described in detail the DNA profiling procedure. A recent opinion of the Colorado Supreme Court provides a thorough picture of this process:

## II. SCIENTIFIC BACKGROUND

A basic understanding of the scientific principles and techniques underlying DNA typing is essential in order to understand the legal issues relating to its admissibility. DNA typing for forensic purposes utilizes a technique in which the characteristics of a suspect's genetic structure are profiled and compared to the genetic structure found in material such as blood, hair, or semen recovered from a crime scene. The two profiles are then compared to see if they match. If the two profiles match, the statistical significance of such a match is calculated to determine the likelihood of a match occurring between the profile derived from the crime scene sample and a third person who is not the suspect. The process by which this is accomplished can be divided into three parts: (A) The theory underlying DNA typing; (B) the techniques which apply that theory; and (C) the method of calculating the statistical significance of a declared match.

### A. DNA theory.

DNA is the material that determines the genetic characteristics of all living things. The significant feature of DNA for forensic purposes is that, with the exception of identical twins, [FN3] no two individuals have identical DNA. Furthermore, because DNA does not vary within a particular individual, a DNA molecule found in one cell will be identical to the DNA found in every other cell of that person.

FN3. Because identical twins originate from the union of a single sperm cell with a single egg, they will share identical DNA molecules.

In human beings, every cell that has a nucleus contains DNA which is distributed across forty-six sections of the nucleus of the cell. These sections are referred to as chromosomes, and they form twenty-three pairs: half of each pair are inherited from the mother, the other half from the father. These twenty-three chromosomes contain thousands of genes which comprise the total genetic makeup of an individual. "Alleles" are polymorphisms of a given gene, i.e., they vary from one individual to the next, and since each gene is represented by two copies (one from each parent) two alleles are inherited for each gene. When alleles that constitute a pair (or "genotype") differ, the person is said to be "heterozygous" for that allele. When a person inherits the same allele from both parents, that person is said to be "homozygous" for that allele.

A DNA molecule is a double helix, resembling a ladder that has been twisted which, if unraveled, would be approximately six feet in length. The "sides" of the ladder are composed of a chain of deoxyribose sugars and phosphates, while the "rungs" are composed of one pair of the following nucleotide bases: Adenine (A), Cytosine (C), Guanine (G), and Thymine (T). According to the "base pair rule," A can only bond with T and G can only bond with C. Thus, the order of the bases on one side of the rung will determine the order on the other side.

Each DNA molecule contains approximately 3 billion base pairs, or rungs, the vast majority of which (99%) do not differ from one human being to the next. It is this similarity in rungs which accounts for the human characteristics of human beings. Certain sections of the DNA molecule differ (i.e., they are allelic) from individual to individual, race to

race, and ethnic group to ethnic group. These areas of variation are called "polymorphic sites." At some polymorphic sites short sequences of base pairs repeat in tandem, over and over again. The core sequence comprising a given allele is called a Variable Number Tandem Repeat (VNTR) and may contain just a few or as many as several dozen nucleotide bases. Because the number of times the core sequence of base pairs repeats may vary among individuals, the length of a given allele, measured in numbers of base pairs, may also vary. For instance, one person may have a particular allele in which a given core sequence repeats only ten times, whereas that same allele in another person may contain the same VNTR that repeats 100 times.

There are approximately three million alleles on each human DNA ladder. While all of these alleles are polymorphic, some are much more polymorphic than others. Forensic DNA typing utilizes a small number of highly polymorphic or "hypervariable" sites.

A DNA profile arrived at through the isolation and comparison of the lengths of several highly polymorphic alleles is known as restriction fragment length polymorphism (RFLP) analysis. (footnote omitted). A DNA profile constructed by means of RFLP analysis is accomplished through the following techniques.

### B. Techniques of RFLP analysis.

1. Extraction of DNA. The biological material that contains DNA must ordinarily be separated from the material in which it is found. Once separated, the DNA is extracted from the samples by a chemical treatment which releases the DNA. An enzyme is then added to digest cellular material other than DNA, rendering a purer DNA sample. [FN5]

> FN5. Myriad problems can arise in extracting DNA in the forensic context. These are due, primarily, to the size and nature of samples the forensic scientist works with. For example, often the sample is not only too small to

subject it to DNA analysis at all, it may also be too small to repeat the DNA typing process. Repeating the process in a clinical setting provides the opportunity to better insure that a declared match is in fact a match, because the clinical scientist can subject the biological material to multiple RFLP analysis. Frequently, such a procedure is not possible in the forensic context. In addition, forensic samples are often contaminated as a result of environmental exposure at the crime scene: semen or blood samples may have been exposed to aging, heat, drying, high humidity, or been contaminated by bacteria. The degradation or contamination of the DNA sample can result in misleading band size or location, and the appearance of nonhuman bands which obscure human ones.

2. Restriction or Digestion. The DNA is then mixed with restriction enzymes which "cut" the DNA molecules into fragments at specific base sequences. These enzymes recognize particular sequences of base pairs and sever the DNA molecule at all sites along the three billion base pair length of the molecule where the targeted base pair sequence occurs. This results in numerous DNA fragments which can vary in length from a few base pairs to several thousand. [FN6]

> FN6. Degraded DNA samples can also complicate this procedure. If a DNA fragment is contaminated, this may cause the restriction enzymes to cut the DNA in the wrong places, causing fragments to be different lengths than they ordinarily would be.

3. Gel Electrophoresis. Next, the DNA fragments are sorted by length through a process known as "agarose gel electrophoresis." The solutions of DNA fragments from the various sources are placed in an electrically polarized gel near the negative electrode. Because DNA is negatively charged, the fragments will migrate towards the positive end of the gel. They will do so, however, to varying degrees based on the length

of the fragment: the shorter fragments, being lighter and less bulky, will travel faster and farther in the gel. Several samples are run on the same gel but in different tracks or lanes which run parallel to one another. In addition to the sample fragments, other fragments of known length are placed in separate lanes of the gel in order to facilitate measurement of the sample fragments. At the completion of electrophoresis, the DNA fragments are arrayed across the gel according to length. [FN7]

> FN7. Variations in the thickness, consistency, temperature and voltage level running through the gel can all contribute to altering the speed and distance with which the fragments move.

4. Southern Transfer and Denaturing. Due to the difficulty of working with agarose gel, the fragments are transferred to a more functional surface through the "Southern Transfer" method. A nylon membrane is placed over the gel and, through capillary action, the DNA fragments permanently attach themselves to the membrane while occupying the same position relative to one another as they had in the gel. At the same time, the fragments are treated with a chemical which splits each base from its complement by "sawing" through the middle of each rung so that the base pairs are separated into two strands. [FN8]

> FN8. Difficulties that may result from Southern Transfer concern the precision and visibility that may be lost as a result of transferring the probes from the agarose gel. Bubbles on the nylon membrane can block the transfer of DNA causing some bands to "disappear." Poor quality Southern Transfers can make interpreting the results very difficult. Finally, it is often difficult to distinguish "background noise" from an actual band.

5. Hybridization. A technique is then employed in order to locate the highly polymorphic alleles contained in the fragments which are useful for forensic DNA typing. This is done by dipping the nylon membrane in a solution of various "genetic probes" which are single-stranded DNA fragments of known length and sequence designed to complement the single-stranded base sequence of polymorphic fragments from the defendant and the crime scene samples. The probes hybridize only to those DNA fragments which contain base pair sequences that are complementary to the base sequence of the probe. Usually three to five different probes are used to isolate multiple alleles. The genetic probes are "tagged" with a radioactive marker so that, after linkage with the half of the core sequence that was split in two, the position of those alleles can eventually be observed. The nylon membrane is then washed to remove excess, unbound probes.

The probe will usually bind to DNA fragments at one or two locations in each lane, depending on whether the individual from whom the DNA was taken is heterozygous or homozygous for that allele.

6. Autoradiography. This process enables the position of the probes, and their complementary and now linked polymorphic fragments, to be recorded. This is done by placing the nylon membrane on an x-ray film which is exposed by the energy of the radioactively tagged probes. This results in a pattern of bands called an autoradiograph, also known as a "DNA print" or "autorad," and is said to resemble a bar code such as those found on many grocery store products. Each band represents a different polymorphic allele and its position indicates the length of the fragment in which that allele occurs. Because the length of alleles may differ among individuals, the position of the bands on the autorad will tend to differ from person to person.

7. Interpretation. Next, the locations of the alleles on the autorad are examined to determine whether or not both DNA samples came from the same person. This comparison can be done through either a visual inspection or with

a machine that measures the bands through a process of computer imaging, or both. In order to declare a match, however, the bands need not line up exactly. Rather, a match will be declared if the bands fall within a certain distance of one another. The Federal Bureau of Investigations, [sic] for example, will declare a match if the length of two fragments fall [sic] within plus or minus 2.5% of one another in base pairs. Cellmark will declare a match if the length of two fragments fall [sic] within 1 millimeter of one another. The smaller the allowable measure of deviation or "match window," the less chance there is that a match can be declared. [FN9]

> FN9. Problems surrounding the interpretation of the autorads include the acceptable measure of deviation in band match that should be allowed before declaring a match, the level of subjective evaluation that inheres in this interpretation, and the level of skill and expertise of the analyst who does the interpreting.

*Fishback v. People,* 851 P.2d 884, 885–88 (Colo.1993).

Having established a scientific background for our discussion, we now examine appellant's contentions.

### 1. *DNA profiling procedure*

■ Appellant challenges the basic procedure used in DNA profiling by claiming failure of the court to determine if FBI laboratory protocols were complied with before allowing the profiling evidence to be admitted. This court has most recently discussed the admissibility of DNA evidence in *Rivera v. State,* 840 P.2d 933 (Wyo.1992). We stated that the correct approach in determining the propriety of

the admissibility of scientific evidence was through analysis under the Wyoming Rules of Evidence, rather than the *Frye* test of general acceptance in the scientific community. *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). *See also, Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and *Frenzel v. State,* 849 P.2d 741, 749 (Wyo.1993). WYO.R.EVID. 702 specifically states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Many courts have admitted the results of DNA testing and it appears there is general agreement on the underlying theory of DNA profiling.[1] We note that some jurisdictions that have admitted DNA evidence have done so under evidentiary rules or a relevancy approach, as opposed to adopting the *Frye* standard. *See Andrews v. State,* 533 So.2d 841, 846 (Fla.App. 5 Dist.1988): relevancy is the "linchpin of admissibility" and is preferable to the " 'general acceptance' approach of *Frye* which is predicated on a 'nose counting' "; and *Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436, 441 (1990) (quoting *Harper v. State,* 249 Ga. 519, 292 S.E.2d 389 (1982)): "The trial court makes this determination based on the evidence available to him rather than by simply calculating the consensus in the scientific community." *See also United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.1992); *State v. Pennell,* 584 A.2d 513, 515 (Del.Super.1989); *State v. Brown,* 470 N.W.2d 30, 32 (Iowa 1991).

As we stated in *Rivera:*

1. *See, e.g., United States v. Jakobetz,* 955 F.2d 786 (2d Cir.1992); *Snowden v. State,* 574 So.2d 960 (Ala.Crim.App.1990); *State v. Pennell,* 584 A.2d 513 (Del.Super.1989); *Martinez v. State,* 549 So.2d 694 (Fla. 5 Dist.App.1989); *People v. Miles,* 217 Ill.App.3d 393, 160 Ill.Dec. 347, 577 N.E.2d 477 (4 Dist.1991); *State v. Brown,* 470 N.W.2d 30 (Iowa 1991); *Smith v. Deppish,* 248 Kan. 217, 807 P.2d 144 (1991); *Cobey v. State,* 80 Md.App. 31, 559 A.2d 391 (1989); *State v.* *Davis,* 814 S.W.2d 593 (Mo.1991); *People v. Shi Fu Huang,* 145 Misc.2d 513, 546 N.Y.S.2d 920 (Co.Ct.1989); *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990); *State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (1990); *State v. Wimberly,* 467 N.W.2d 499 (S.D.1991); *Kelly v. State,* 792 S.W.2d 579 (Tex.Ct.App.1990); *Spencer v. Commonwealth,* 238 Va. 275, 384 S.E.2d 775, 84 A.L.R. 4th 293 (1989).

[I]n ruling upon the offer of such evidence in Wyoming, our trial courts need only be concerned with the requisite foundation. Because it does appear the possibility of an erroneous result is more likely to arise from the testing techniques than from the procedure, it is important for the trial court to be satisfied about the manner in which the testing was performed, and the qualifications of the individual who accomplished the scientific technique. These factors, however, are no different from those generally related to the acceptance of scientific evidence from an expert, and we do not perceive we are formulating any new law.

*Rivera*, 840 P.2d at 942.

We find that our determination in *Rivera* parallels a most recent decision of the United States Supreme Court. See *Daubert*, —— U.S. ——, 113 S.Ct. 2786. In that opinion, the Court listed some "general observations" to be considered by the trial court, including whether the scientific theory or technique: 1) can or has been tested; 2) has been the subject of publication or peer review; and 3) has a "known or potential error rate." *Daubert*, —— U.S. at ——, 113 S.Ct. at 2790.

We agree that the "focus of the court must be on 'the admissibility or non-admissibility of a particular type of scientific evidence,' not 'the truth or falsity of an alleged scientific "fact" or "truth." ' " *Jakobetz*, 955 F.2d at 796–97 (quoting *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

In other words, the court need not make the initial determination that the expert testimony or the evidence proffered is true before submitting the information to the jury. The court must allow the jury· to discharge its duties of weighing the evidence, making credibility determinations, and ultimately deciding the facts.

*Jakobetz*, 955 F.2d at 797. As the court stated:

The test thus boils down to whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. See McCormick § 203 at 607. This "helpfulness test subsumes a relevancy analysis", 3 Weinstein & Berger, Weinstein's Evidence § 702[02] at 18, which in turn assumes a threshold of reliability.

*Jakobetz*, 955 F.2d at 796. We have determined that "whether the evidence assists the trier of fact is premised on the reliability of that evidence." *Frenzel*, 849 P.2d at 750. In turn, this determination will be based on whether the underlying theory is scientifically valid and pertains to the facts of the case. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2790,

Though cases presenting "novel, complex, and confusing evidence" may pose difficulties, it is imperative that the jury retain its fact-finding function. *Jakobetz*, 955 F.2d at 796. However, this does not mean that a proper foundation need not be laid prior to the admissibility of scientific testing or laboratory procedures. *United States v. Two Bulls*, 918 F.2d 56, 60 (8th Cir.1990). "If there is no proper foundation laid, then expert testimony does not 'assist'. the jury in the search for truth." *Ferris v. Myers*, 625 P.2d 199, 204 (Wyo. 1981). If the procedures produce an unreliable result, then the court may exclude the evidence entirely. *People v. Lipscomb*, 215 Ill.App.3d 413, 158 Ill.Dec. 952, 964, 574 N.E.2d 1345, 1357 (1991).

Special Agent Audrey Lynch, who holds a bachelor's degree in biology and a master's degree in cell biology, is an eleven-year veteran with the FBI, having conducted twelve years of research at several universities before joining the federal agency. Agent Lynch's testimony described internal control procedures used by the FBI in the profiling process, particularly that a "cell line" or known human DNA sample was used in every analysis; every FBI examiner is given an open proficiency test four times per year and one hundred percent of those tested at the time of trial have passed; the DNA of the blood sample from the victim and the female fraction from the swab sample match, showing that the forensic sample did indeed come from the

victim; and the FBI does between 1500 to 2000 DNA cases per year.

Appellant's expert, Dr. Shields, reviewed the scientific evidence from the FBI laboratory, including the autorads generated for appellant and his brothers. He noted that in this case two sets of tests were done but the FBI sizing sheets that look at the size of the bands for a particular autorad and the computer-generated sizing picture were only provided for one of the tests. Shields commented that appellant's sample was never run a second time against appellant's brothers' samples, but that they were compared to the initial autorad of appellant. Shields commented that it "would have been nice to run the brother again to make sure he came out the same as he did before." He testified that there may be an unconscious bias involved when the technicians running the test know the identity of the sample they are testing. On cross-examination, Shields responded to the following question:

Q And in general, you have no quarrel with the quality of the lab work done by the FBI; is that correct?

A In general I do not. I have had specific instances. This isn't one of them.

The state's expert witness, Dr. Conneally, examined the autorads and lab notes generated in this case and stated that the autorads were excellent. He concluded that "if the protocol had not been adhered to, we wouldn't have a good product."

■ Concern about specific procedures goes to the reliability of evidence and the weight given by the jury. *Lipscomb,* 158 Ill.Dec. at 954, 574 N.E.2d at 1347. We agree with the *Jakobetz* court:

The district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue would go more to the weight than to the admissibility of the evidence. Rarely should such a factual determination be excluded from jury consideration. With adequate cautionary instructions from the trial judge, vigorous

cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.

*Jakobetz,* 955 F.2d at 800.

Appellant's expert identified his concerns surrounding the DNA profiling process, though he had no general problems with the quality of work performed in this case. Appellant's counsel had ample opportunity to cross-examine Lynch on the specifics of laboratory protocol. We discern no abuse of discretion under *Rivera* and Wyo.R.Evid. 702 in permitting the DNA profiling evidence to be admitted. We find it to be well within the province of the jury to weigh such testimony in its fact finding process.

### 2. Statistical probability

■ Following the declaration of a match, the next step is to determine its statistical significance, or the likelihood that the forensic sample came from a third person carrying the same DNA as appellant. This is done by calculating how frequently each band produced by one probe appears in the population database. Appellant's primary objection to the admission of the DNA evidence involves recent controversy in the field surrounding the possibility of "substructure" within a specific race, resulting in an underestimation of the comparison population statistics. *See, People v. Wallace,* 14 Cal.App.4th 651, 17 Cal. Rptr.2d 721 (1 Dist.1993); *People v. Pizarro,* 10 Cal.App.4th 57, 12 Cal.Rptr.2d 436 (5 Dist.1992); *People v. Barney,* 8 Cal.App. 4th 798, 10 Cal.Rptr.2d 731 (1 Dist.1992); *Caldwell,* 393 S.E.2d 436; *People v. Adams,* 195 Mich.App. 267, 489 N.W.2d 192 (1992); *People v. Mohit,* 153 Misc.2d 22, 579 N.Y.S.2d 990 (Co.Ct.1992); *People v. Wesley,* 183 A.D.2d 75, 589 N.Y.S.2d 197 (3 Dept.1992); *State v. Cauthron,* 120 Wash.2d 879, 846 P.2d 502 (1993).

The FBI makes the statistical probability determination through a process known as "binning." Binning is a method of measuring the size of alleles or bands and has been described as follows:

The bins, as they are called by the F.B.I., were established with reference to the size markers that were run with each test. The size markers, or sizing ladders as they are also called * * * are commercially available solutions composed of DNA fragments of known, predetermined fragment lengths. The size markers appear on the final autorad as an array of bands relatively evenly distributed along the length of the gel. Because the fragments of the size markers are of known lengths, the size of an individual's DNA bands can be determined by comparison to the band of known length on the sizing ladder that is nearest in location to the sample band of unknown length.

In the fixed bin procedure, the size markers define the boundaries of the bins. The frequencies associated with the bins were established by assigning the bands generated from the [target population] to the bins into which the bands fell. After all the profiles of the [target population] were completed, and the bins into which their bands fell were determined, the total number of bands located in each bin were counted. As to each probe, the frequency for each bin was calculated by the simple procedure of dividing the total number of bands located in a bin by the total number of bands resulting from the profiling of all the [target population] tested for that probe.

The F.B.I. applied a standard statistical safety measure used in data collection studies of this sort by "collapsing" into each other, bins that contained fewer than five occurrences. That is, if a particular bin displayed fewer than five bands it would be merged into the adjacent bin and this process was continued until there was a total of at least five bands. The resultant bin would be larger in size. The frequency associated with this bin would be calculated in the same manner described above.

*United States v. Yee,* 134 F.R.D. 161, 172 (N.D.Ohio, 1991). Once bin frequencies are established for the target population, the same calculation is made to determine the frequency of the bands in the forensic sample DNA profile.

When a [forensic sample] band is located between two adjacent size marker bands, that [forensic sample] band is said to lie in the bin defined by those two adjacent size marker bands. The frequency assigned to the [forensic sample] band is the frequency that had previously been determined for that bin through the frequency study described above.

If a [forensic sample] band is found to lie on the border of two bins, the F.B.I. deems that band to belong to the bin that has the highest frequency, i.e., the more common bin. This, according to the F.B.I., is a conservative measure that favors the defendant because the subsequent calculation will use a number that is of a greater magnitude, thereby raising the final frequency and diminishing the degree of rareness associated with the occurrence of that DNA profile in the population.

*        *        *        *        *        *

Finally, after the frequencies of occurrence for the profiles of the different probings are calculated, the aggregate frequency for the overall DNA profile can be computed by simply multiplying together the frequencies determined for the several probings. The reason that these frequencies associated with the different loci (as the area of the gene identified by a probe is called) can be multiplied together is that the occurrence of the genetic events at any one loci are considered to be independent of the occurrence of the genetic events at any other loci. Given this assumption, one of the most rudimentary principles of probability theory then follows: that the frequency of occurrence of independently occurring events may be multiplied by one another to determine the frequency of occurrence of the aggregate of those events.

*Yee,* 134 F.R.D. at 172–73. The assumption that there is no statistical correlation between the two alleles that comprise a genotype is referred to as "Hardy–Wein-

berg equilibrium." *Fishback,* 851 P.2d at 888. Then, assuming there is no correlation between genotypes "linkage equilibrium" is said to exist. *Fishback,* at 888. Under the product rule, the frequency of each allele comprising a genotype is multiplied together creating a frequency for that genotype. These resulting genotype frequencies are then multiplied together as well.

Lynch described the binning procedure utilized by the FBI as a "very conservative approach" to handling the data. Lynch stated that the method overestimated the frequency of bands in the population, so that any bias would be in favor of appellant. The database bands were "binned" to determine the frequency of occurrence of particular bands in the database population. The bins were then "collapsed" until there were five bands per bin. A third conservative step was employed whereby data from the Indian population sample was divided according to the "source of the blood," binned, the bins collapsed and then compared, side-by-side. The bin showing the highest frequency in this comparison was then used in the statistical calculation. The percentage of frequency from the highest frequency bins was totalled and then divided by the number of bins to determine a minimum bin value. Appellant's DNA profile was then looked at probe by probe and the frequency of each band was multiplied together under the product rule to determine the frequency of this particular composite of bands occurring in the database population.

At the April 1992 hearing on the admissibility of DNA testing, Dr. William Shields and Dr. Michael Conneally provided expert testimony as they have previously on DNA issues. *Lipscomb; State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483, 494 (1992). Dr. Shields stated that, in his opinion, the statistical conclusion arrived at by the FBI is not scientifically reliable. He categorized the problem in this way:

[T]he primary criticism that people have made of the use of these analyses in forensic cases is that if allele frequencies, if the frequency of bands differ between populations, between subpopulation, between ethnic groups within races and even between races, then you have to know something about those distributions in order to develop an unbiased estimate of the frequency of the event, and if you ignore the possibility of those differences, then you end up with a number that have [sic] very little bearing on reality.

According to Dr. Shields, Indian tribes are a "subgroup of a subgroup of a racial classification." In looking at the same allele segments used by the FBI in their analysis, Dr. Shields cited major differences that exist between Native American groups in Canada, which constituted a "monsterous allele frequency difference." In another example, Dr. Shields discussed the findings of Dr. Ken Kidd, concerning "statistically significant allele frequency differences" among two South American tribes living 300 miles apart and a tribe in Mexico. The underlying theory that supports the frequency difference is called endogamous breeding, or a tendancy for individuals to mate "with individuals that they grew up with; in essence, individuals from the same geographic locale, the same ethnic group, the same religion, the same socioeconomic status." In sum, Dr. Shields put it this way: "[I]f you use the appropriate database, you may actually find lots of matches. If you use the wrong database, you may have none * * *."

On cross-examination, Dr. Shields acknowledged the following:

Q Would you agree that the fixed bin system utilized by the FBI has conservative features specifically designed to protect against an overstatement of the significance of a match?

A They have those features relative to other alternative systems, yes.

\* \* \* \* \* \*

Q And, in fact, the FBI recognizes substructure, does it not?

A Yes, it does.

Q Would you say that the FBI has rightfully received praise for its use of

binning procedure and frequency analysis?

A Yes, I would.

Dr. Conneally, testifying as an expert for the state, remarked that population samples are always used in determining statistical estimates and that the FBI's binning procedure, utilizing the product rule, is known to be a generally accepted technique. He described the FBI's binning technique as providing a conservative overestimate of the frequency, particularly because of the rebinning procedure utilized if less than five bands were placed in one bin. On the issue of substructuring, Dr. Conneally noted that previous to World War II much more endogamy existed. He stated:

> There is no evidence for any major differences in bands in major populations, number one, and number two, it has been shown, as I said earlier, even if there is some substructuring, as long as there is some cross-marriage which we know, common sense tells us, does occur because all of us know some of our friends or neighbors who, in fact, are not purely ethnic, from pure ethnicity, because there is a cross-marriage. * * * [A]nd even if there was a small amount of non-independence, it's more than taken care of. The difference it would make is much much smaller than the conservative approach of binning. The binning more than makes up for any small differences there might be.

Dr. Conneally described recommendations from the National Research Council's report on DNA Technology in Forensic Science. The council recommended placing a ceiling on the gene frequencies generated for each bin by raising the frequency to ten percent if it was found to be less than that. According to the council's report,

> [u]se of the ceiling principle yields the same frequency of a given genotype, regardless of the suspect's ethnic background, because the reported frequency represents a maximum for any possible ethnic heritage. Accordingly, the ethnic background of the individual suspect should be ignored in estimating the likelihood of a random match. The calcula-tion is fair to suspects, because the estimated probabilities are likely to be conservative in their incriminating power.

NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE, 13, 1992. Dr. Conneally stated that the report was published only a few days before this evidentiary hearing so that this specific recommendation was not used by the FBI in computing results in appellant's case. However, Dr. Conneally re-calculated the statistics from the FBI's data using the report's recommended ceiling principle and determined probabilities of one in seventeen million for the black database and one in 221,000 for the Indian database.

Appellant argues that the trial court improperly admitted the statistical evidence concerning the significance of the DNA match because of the possibility that the Crow tribe comprises a substructure within the Native American population. Appellant argues that the Crow population is not in Hardy–Weinberg equilibrium and using the product rule to calculate the frequency of appellant's DNA composite is, therefore, inappropriate. Appellant makes this claim absent any support that the Crow tribe is endogamous.

We agree that "any question concerning the size of the database or the Hardy–Weinberg equilibrium goes to the weight of the evidence and is properly left to the jury." *Adams*, 489 N.W.2d at 198 (quoting *People v. Proveaux*, 157 Mich.App. 357, 403 N.W.2d 135 (1987)). We are persuaded that "the potential impact of substructure on the accuracy of such estimates is, in the final analysis, a matter of weight for the jury to consider, rather than of admissibility." *Yee*, 134 F.R.D. at 210.

More generally, *Rivera* challenged the admissibility of the statistical probability of a DNA match as invading the province of the jury. We concluded that "at some level, the statistical probability could be perceived as an opinion by the expert that the accused is guilty" and that the "better practice in Wyoming should be not to refer to the statistical probability of duplication when introducing DNA test results." *Riv-*

*era*, 840 P.2d at 942. The rule we applied in coming to this conclusion was found in *Stephens v. State*, 774 P.2d 60 (Wyo.1989). In that case, where mental health professionals specifically testified that the victim was abused at the hands of the defendant, we held that "[s]uch testimony cannot be perceived to address an area in which expert testimony provides assistance to the jury in resolving a factual issue." *Stephens*, 774 P.2d at 67.

At trial, Lynch asserted:

The conclusion I reached after doing my analyses on the four different autorads was that, in fact, we did have a match. * * * Again, a match means one of two things. Either those samples came from the defendant, Mr. Springfield, or from somebody else in the population who would have that same DNA profile across all four probes, and that's where the probabilities come into it.

If we are to follow our previous application of *Stephens* in *Rivera*, then Agent Lynch's testimony would be permitted only to the point that she declared a match of the DNA samples. It would then be up to the jury to interpret the significance of this broad general statement. Does a match mean that the defendant is the perpetrator? Could anyone else have possibly contributed the sample? We must conclude, as did the Iowa court in *Brown*, that "the ultimate results of DNA testing would become a matter of speculation" without statistical evidence. *Brown*, 470 N.W.2d at 33. *See also, Vandebogart*, 616 A.2d at 494: finding that a "match is virtually meaningless without a statistical probability expressing the frequency with which a match could occur." We agree that

[t]he statistical calculation step is the pivotal element of DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns.

*Barney*, 10 Cal.Rptr.2d at 742.

In recent cases where the FBI's process of estimating the frequency of appellant's DNA profile has not been admitted because of lack of general acceptance in the field of population genetics, discussion has cen-

tered on the "ceiling frequency" or "ceiling principle" recommended in the April 1992 report of the National Research Council's Committee on DNA Technology in Forensic Science. *Barney*, 10 Cal.Rptr.2d at 745; *See, Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311, 316 (1992); *Vandebogart*, 616 A.2d at 494–95; *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502, 517 (1993). These courts, all of which use a *Frye* type standard for admissibility, have concluded that the basic FBI process for generating statistics does not meet *Frye*, but have held out hope (even by remand in *Vandebogart*) that by application of the ceiling principle, the statistical process would meet the *Frye* standard.

Because we apply Wyo.R.Evid. 702 in our analysis, we need not hope for the acceptability of the ceiling principle application but we do recognize that the most conservative estimate has been accepted by courts who have struggled with the issue of substructure. For example, in *Mohit*, 579 N.Y.S.2d at 997, 998, the court accepted Dr. Conneally's ten percent adjustment of the statistics where the defendant, an Iranian Shiite Muslim, had virtually no chance that anyone of the same race appeared in the population database.

With Rule 702 as our guideline, we conclude the probability statistics will assist the trier of fact and that the computation by Dr. Conneally, applying the ceiling principle, has provided the most conservative statistical estimate as recommended by the NRC report. We concur that

[s]tatistical evidence does not remove the issue of identity from the jury, which is free to disregard or disbelieve expert testimony.

*Brown*, 470 N.W.2d at 33. *See also, Adams*, 489 N.W.2d at 198.

*OTHER ISSUES*

*Sufficiency of evidence*

■ Appellant next argues that insufficient evidence exists to convict him of the crime charged. Appellant premises this contention on the improper admission of DNA evidence which, according to him,

provided the only link to the crime, since the victim could not identify appellant as her assailant.

Our standard for reviewing a sufficiency-of-the-evidence claim

is this court's assessment as to whether all of the evidence presented is "adequate to support a reasonable inference of guilt beyond a reasonable doubt to be drawn by the finder of fact, viewing the evidence in the light most favorable to the state." * * * We do not substitute our judgment for that of the jury in applying this rule, and our only duty is to determine if a quorum of reasonable and rational individuals would, or even could, have come to the same result the jury actually did.

*Saldana v. State,* 846 P.2d 604, 619 (Wyo. 1993) (citations omitted). *See also, Wehr v. State,* 841 P.2d 104, 110 (Wyo.1992); *Dreiman v. State,* 825 P.2d 758, 760 (Wyo. 1992).

As we have explained in detail, the evidence of the DNA match and the corresponding statistics were properly admitted by the trial court. Nevertheless, we review whether the "admissible evidence presented at trial, viewed collectively, was sufficient." *Saldana,* 846 P.2d at 619.

The issue throughout the trial was the identity of the assailant. Though the victim could not specifically identify appellant, she was able to give a description of her attacker as muscular or agile, with brown eyes and dark skin. By his voice, she could judge that he was fairly young and a little bit taller than her when she had on high heels. At trial, she remarked that appellant "definitely resembles him. I can tell by his eyes."

It is not our function to assess the facts of this case or reweigh the evidence. *Mondello v. State,* 843 P.2d 1152, 1161 (Wyo. 1992). In this process, we must assume that "the jurors believe only the evidence adverse to the defendant." *Farbotnik v. State,* 850 P.2d 594, 603 (Wyo.1993). It is the role of the jury, as fact finder, to evaluate the evidence by comparing the victim's description to the physical charac-teristics of appellant, as well as weigh the credibility of the witness. Considering all of the evidence taken together, the evidence was sufficient for "reasonable and rational individuals" to conclude that the appellant was the perpetrator. *Mondello,* 843 P.2d at 116.

### Camera evidence

■ Appellant next claims he was unfairly prejudiced and thus denied a fair trial by the introduction of evidence regarding the camera when it could not be proven that appellant had any connection to it.

In opening statement, the state discussed the theft of the camera and lenses from Ken Collier on the same night as the assault and remarked that appellant had offered to sell these stolen goods to a third party. In the state's case, Ken Collier testified to the theft from his home on the night of the assault. No objections were made to the opening statements or Collier's testimony. Instead, appellant's counsel in opening statement referred to the camera theft, remarking that the prosecutor said

they can prove that [appellant] had the camera, and therefore, prove that he was in the area. That we disagree with.

\* \* \* \* \* \*

[T]he individual [state's witness] who ended up with this camera will testify that he got the camera from an individual in Great Falls, Montana; not from [appellant].

Finding no objection by appellant at trial, we apply a plain error standard of review:

The "plain-error" doctrine will be applied only where the error seriously affects the fairness or integrity of judicial proceedings. There must be a transgression of a clear and unequivocal rule of law, in a clear and obvious way, which adversely affects a substantial right.

*Whiteplume v. State,* 841 P.2d 1332, 1343 (Wyo.1992) (quoting *Jones v. State,* 580 P.2d 1150, 1153 (Wyo.1978)) (citations omitted). *See also, Collins v. State,* 854 P.2d 688, 698 (Wyo.1993).

Appellant contends that because the camera theft was never connected to him, the evidence surrounding the theft was irrelevant under Wyo.R.Evid. 402 and any mention of it unfairly prejudicial. Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.

We have previously said that "[r]ulings on the admission of evidence are within the sound discretion of the trial court and, in the absence of a clear abuse of discretion, its rulings will not be disturbed." *L.U. Sheep Co. v. Bd. of County Comm'rs*, 790 P.2d 663, 673 (Wyo.1990). This exercise of discretion extends to determination of the relevancy of proffered evidence. *L.U. Sheep*, 790 P.2d at 673. Though most evidence offered by the state in a criminal case is harmful to the defendant, it must also be perceived as unfair, "extremely inflammatory or introduced for the purpose of inflaming the jury." *Jennings v. State*, 806 P.2d 1299, 1305 (Wyo.1991).

Appellant likens his case to that of *Schmunk v. State*, 714 P.2d 724 (Wyo. 1986). In that case, Schmunk objected to the introduction of evidence of alleged prior misconduct. That evidence had been the basis of an order granting an initial change of venue to avoid prejudicial pretrial publicity concerning the misconduct as well as prohibited from introduction by order of the court. *Schmunk*, 714 P.2d at 728–30. We found this a grievous error, and even more so because of the state's failure to present a Wyo.R.Evid. 404(b) reason for its introduction. *Schmunk*, 714 P.2d at 730.

Appellant's comparison to *Schmunk* misses the mark. The state's attempt to connect appellant to the camera theft was intended to show only how appellant became an initial suspect in the assault, and it is difficult to see how this failed attempt in any way prejudiced appellant. The state's witness testified that he bought the camera from an unknown hitchhiker and did not implicate appellant in the theft. Though appellant's counsel apparently anticipated the state's inability to prove this link and made use of this lack of proof in his opening statement, no pre-trial motion was filed to keep this evidence out. Additional evidence sought to be introduced by the state regarding the camera was inadmissible as hearsay and the court instructed the jury to disregard it entirely.

Appellant now claims that if this evidence had not been admitted, there would have been no evidence placing appellant in the area. As it turned out, the state's failure of proof, if anything, only helped appellant's case in that the state could not show through the camera evidence that appellant was in the neighborhood on the night of the assault. We find no abuse of discretion to admit this testimony.

*Speedy Trial*

Appellant argues that his right to a speedy trial under the Wyoming and United States Constitutions was violated when the information against him was filed on May 9, 1991, but his trial was not held until April 27, 1992. We note:

This court's speedy trial jurisprudence is an amalgam of the balancing test of *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116 (1972) and the provisions of Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming. *Osborne v. State*, 806 P.2d 272, 277 (Wyo. 1991).

*Whiteplume*, 841 P.2d at 1335. In applying the balancing test, we consider and weigh its four parts: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of [his] right; and (4) the prejudice to the defendant." *Whiteplume*, 841 P.2d at 1335. We consider District Court Rule 204 as "advisory in nature" and a "factor to be considered in the balancing test." *Whiteplume*, at 1335. Rule 204 states in pertinent part:

(b) A criminal charge shall be brought to trial within 120 days following the filing of information or indictment.

(c) The following periods shall be excluded in computing the time for trial:

\* \* \* \* \* \*

(3) Delay granted by the court pursuant to Section (d)

\* \* \* \* \* \*

(d) Continuances may be granted as follows:

\* \* \* \* \* \*

(2) On motion of the prosecuting attorney or the court if:

(i) The defendant expressly consents; or

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(e) Upon receiving notice of possible delay the defendant shall show in writing how the delay may prejudice his defense.

The filing of the criminal complaint or arrest of the defendant begins the speedy trial clock under the constitutional analysis. *Whiteplume*, 841 P.2d at 1335. Appellant claims that if all the time was considered between the filing of the complaint on May 9, 1991, and appellant's trial date on April 27, 1992, a total of 355 days elapsed.[2] Under Rule 204 analysis, using the information filing date as the starting point, appellant calculates a lapse of 319 days. No precise length of delay determines a speedy trial violation, though we have held delays of over 500 days to be presumptively prejudicial. *Harvey v. State*, 774 P.2d 87, 94 (Wyo.1989), *cert. denied*, —— U.S. ——, 113 S.Ct. 661, 121 L.Ed.2d 586; *Phillips v. State*, 774 P.2d 118, 125 (Wyo.1989). We have recognized delays similar in length to appellant's 355 and 319 days sufficient to warrant a speedy trial analysis. *Wehr*, 841 P.2d at 112 (320 and 238 days); *Osborne v. State*, 806 P.2d 272, 277 (Wyo.1991) (244 and 301 days).

We begin to analyze appellant's claim by recognizing that continuances may be granted under District Court Rule 204(d)(2)(iii) if required in the due administration of justice and substantial prejudice to the defendant will not result. Once we analyze the reason for delay, we then must try to discover the motives of the prosecutor. *Caton v. State*, 709 P.2d 1260, 1265 (Wyo.1985). In determining the reasonableness of any delay, we consider whether appellant asserted his right to a speedy trial below and how vigorously he has done so. *Wehr*, 841 P.2d at 113. District Court Rule 204(e) also requires the defendant to show in writing how a delay will prejudice his defense. We take notice of three types of prejudice: (1) lengthy pretrial incarceration, (2) pretrial anxiety, and (3) impairment of defense. We have determined prejudice to be a "very important factor" in our speedy trial analysis, though "not absolutely required" to demonstrate a speedy trial violation. *Wehr*, 841 P.2d at 114 (citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

**2.** Chronology of events:

- May 9, 1991—Complaint and warrant for appellant's arrest filed.
- May 9–31, 1991—Sometime in this period, appellant is arrested.
- June 7, 1991—Appellant waives preliminary hearing.
- June 11, 1991—Bail set and appellant incarcerated.
- June 13, 1991—Information filed, arraignment held and trial set for August 5, 1991.
- July 3, 1991—Court's omnibus discovery order.
- July 25, 1991—State files motion for continuance because of unavailability of FBI DNA witness.
- July 29, 1991—Court grants continuance and resets trial date to October 15, 1991.
- August 8, 1991—Bail reduced.
- October 7, 1991—Appellant released on bail.
- October 7, 1991—State motions for second continuance to test brothers; hearing held; defendant objects to continuance on the record. Appellant's counsel notes at hearing that state will be looking for probability statistics witness.
- October 24, 1991—Court files order granting state's second continuance and reseting trial date for January 13, 1992.
- January 3 & 30, 1992—Appellant files motion to exclude Dr. Conneally.
- February 10, 1992—Court resets trial date to April 27, 1992.
- April 14, 16, 1992—Hearing on motion to exclude DNA evidence.
- April 27, 1992—Trial begins.

On July 25, 1991, the state sought a continuance due to the unavailability on the August 5, 1991 trial date of the FBI agent who had conducted the DNA testing. Appellant neither entered objection nor did he show how he might be prejudiced by a continuance under Rule 204(e) and the motion was granted by the court. The rule specifically provides for continuance if the state's evidence is unavailable, and we have deemed that the unavailability of a state's witness is excuseable from the speedy trial calculation. Rule 204(d)(2)(ii), Uniform Rules of the District Courts for the State of Wyoming; *Wehr*, 841 P.2d at 113.

The state sought a second continuance on October 7, 1991, in order to conduct DNA testing of appellant's brothers. At a hearing on the state's motion, the prosecutor noted that the probability difference of a "random match among the defendant's brothers and that of the general population" is significant. He stated:

If none of the defendant's brothers match that DNA profile, that would be evidence that would be highly inculpatory. If, on the other hand, one of the brothers should match that DNA profile, that would be evidence that would be highly exculpatory of this defendant.

Appellant "strenuously" objected to the continuance and noted:

The State doesn't have an expert to testify as to the statistical probability or improbability of somebody else matching that. The next step in this thing will be to move to name some more experts so that the State can be better prepared in this thing.

The state indicated that the significance of a match among siblings had been noted following the commencement of the case and the state had since been trying to locate appellant's four brothers. In ruling on the motion, the court questioned appellant's counsel stating:

[The court]: The thing that you are objecting to other than the fact that the State might get some other evidence that might be inculpatory or even exculpatory is the delay beyond the 120 days because your client has not been able to make

bond and will be in jail for another two or three months, right?

[Appellant's counsel]: That's easily the significant aspect of it for sure.

At that point, the court reduced appellant's bond to an unsecured amount. The court found the additional testing to be relevant, the state had exercised due diligence and the continuance would be required in the due administration of justice under the rule. The trial was reset for January 13, 1992.

On January 3, 1992, appellant moved to exclude Dr. Conneally as an expert witness on statistical probabilities of a DNA match, primarily because the state failed to include Dr. Conneally in a witness list under the court's omnibus discovery order of July 3, 1991. At a hearing on appellant's motion, the court stated:

I think it's pretty obvious to everybody that [the DNA testing of the brothers] would require some kind of testimony of a statistical person to analyze what those results mean. I can't believe that anybody is shocked by somebody being called to testify in this regard.

The court informed appellant that a continuance would be granted if appellant wanted to get a similar witness to testify at trial. The state explained that until it received notice on December 16, 1991, by the DNA examiner that no match was found among the brothers, a population geneticist was not needed to testify. Appellant never filed a motion for continuance and appeared to indicate at the hearing that he would not want one. The record is silent concerning why on February 10, 1992, the court then reset the trial date to April 27, 1992. Appellant did procure Dr. Shields to testify on the significance of statistical probability.

The time elapsed as a result of the first continuance granted to the state between the first trial date of August 26 to the rescheduled date of October 15 is seventy-one days. Finding no objection from appellant and no prejudice to him, we subtract that time from the speedy trial calculations.

The second continuance resulted in an additional ninety days of delay. However, the trial court found that the gathering of additional relevant evidence justified the continuance and was in the due administration of justice. Appellant may well have gained exculpatory evidence by this testing. Apparently the greatest concern, of continued incarceration, was addressed by the lowering of appellant's bail and securing appellant's release. We find no prejudice in the second continuation and subtract the ninety days from the total.

The final delay involved appellant's objection to the inclusion of Dr. Conneally as an expert witness. Appellant complains that the state violated the court's omnibus discovery order by not listing Dr. Conneally as a witness, nor listing him at any time following the first and second trial dates and as such prejudiced appellant. However, there are indications that as early as October 7, 1991, appellant anticipated that the state would call a population geneticist to testify. Whether appellant sought a continuance or not following the court's decision to permit Dr. Conneally to testify, appellant did procure his own expert in this area. It is hard to see how appellant was prejudiced by this further delay.

We conclude that none of the delay in bringing appellant to trial may be included in the speedy trial calculation. The result leaves appellant under constitutional and District Court Rule 204 analysis with an elapsed time of ninety-two days and fifty-six days, respectively, before trial commenced. No violation of the right to a speedy trial is found.

*Cumulative Error*

■ As his last argument, appellant claims that his conviction should be reversed under the doctrine of cumulative error. We have said, "[a] claim of cumulative error cannot be recognized where there is no underlying error to support it." *Young v. State*, 849 P.2d 754, 767 (Wyo. 1993) (quoting *Jennings*, 806 P.2d at 1306). Finding that appellant's claims do not show error, we cannot possibly agree with appellant that cumulative error exists requiring reversal.

**DISPOSITION**

We hold that evidence of the DNA match and the accompanying statistical probability was properly admitted. We find no error in the prosecution's introduction of the camera issue. We have found sufficient evidence to support appellant's conviction and that appellant's speedy trial rights were not violated as claimed. As such, the claim of cumulative error can not stand. Appellant's conviction is affirmed.

THOMAS, J., files an opinion, concurring specially.

THOMAS, Justice, concurring specially.

I agree Springfield's conviction can be affirmed, but I have a concern with respect to the holding of the majority that we should depart from the rule articulated in *Rivera v. State*, 840 P.2d 933, 942 (Wyo. 1992):

> Our conclusion is that, at some level, the statistical probability could be perceived as an opinion by the expert that the accused is guilty. At least, it would be possible for the jury to draw that inference from statistical probabilities associated with the DNA evidence alone. We, therefore, believe the better practice in Wyoming should be to not refer to the statistical probability of duplication when introducing DNA test results.

The majority chooses to overrule *Rivera* in favor of the reasoning of *State v. Brown*, 470 N.W.2d 30 (Iowa 1991), and to hold that the evidence of statistical probabilities must be presented to the jury.

I am not persuaded by the conclusion of the Iowa Supreme Court that the result of the DNA testing without the statistical probability evidence becomes a matter of speculation. The same comment could be made about any other circumstantial evidence. I contend the DNA match is simply circumstantial evidence that can justify an inference by the jury on the issue of identity.

I still feel the concern, expressed in *Rivera,* that the introduction of such evidence in most cases amounts to an opinion on guilt, which this court eschewed in *Stephens v. State,* 774 P.2d 60 (Wyo.1989). Qualitatively, I find very little difference, if any, between testimony that, in the opinion of the expert, the defendant committed the crime charged and testimony that, in the opinion of even the defense expert, only one other person in seventeen million could have committed the crime charged. In my view, both statements constitute opinions as to guilt. The facile claim in *Brown,* following *Martinez v. State,* 549 So.2d 694 (Fla.Dist.Ct.App. 5 Dist.1989), that such evidence does not remove the issue of identity from the jury because it is free to disregard or disbelieve expert testimony is not persuasive. In instances such as this, there is no rational justification for the jury to disregard such testimony, and the pragmatic fact is that juries will not do so. In nearly all instances, this evidence is conclusive on the issue of identity.

The more profound question then is the inquiry with respect to what has happened to the right of the accused under both the federal and state constitutions to a trial by jury. I have no equivocation in stating that, when the evidence of statistical probabilities is received, the trial is by the DNA scientist, and the trial to the jury, in the light of overwhelming evidence of statistical probability, is a legal facade. As the science of DNA testing and matching becomes more advanced, the prediction is that the statistical probabilities of another match will become smaller and smaller. In that context, the evidence of statistical probabilities must become even more overwhelming. The accused with a DNA match, when the evidence of statistical probability is introduced, will be left with no practical choice other than to plead guilty in exchange for some sentencing consideration. In most such instances, the bargaining power of the accused must be perceived as negligible.

My concern is that we may be in the process of creating a jurisprudential Frankenstein. In an effort to invest DNA evidence with life and breath, we may find, in this limited context, we have structured a rule that takes away the life and breath of the right to a jury trial. If the judiciary perceives that it cannot go so far, the likely reaction is to slay the monster, not in parts but totally, leading to the inadmissibility of even the fact of a DNA match. Yet, this scientific technique has far too much value to the fact finding process to be legally denied.

For me, the middle ground is to maintain the admissibility of the opinion as to match but, in a criminal case, the prosecution should not introduce the evidence of statistical probabilities. If the accused chooses to delve into this area, I would justify that as a matter of trial strategy, but the accused would have to accept any adverse consequences.

I have styled this as a concurring opinion for two reasons. Springfield was tried prior to the filing of the opinion in *Rivera,* and the trial judge did not have the benefit of that holding when making his ruling. Since, in this instance, there is a marked difference between the Black database (one other match in one hundred fifty million), the Caucasian database (one in two hundred fifty million), the Hispanic database (one in twenty-five million), and the Indian database (one in two hundred fifty thousand), Springfield could present to the jury an argument that reasonable doubt existed as to the issue of identity since, if the population of Wyoming were composed of entirely Native Americans, there could have been one other person who might also be matched by the DNA profiling. Obviously, the argument as to reasonable doubt was not successful, but I am willing to agree there was no prejudicial error given the much larger odds using the Indian database.

I would affirm Springfield's conviction, but I would reaffirm the rule from *Rivera.*